REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Lawrence D. Rosenberg
(admitted *pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001.2113
Telephone: +1.202.879.3939
Facsimile:  +1.202.626.1700
ldrosenberg@jonesday.com

Alexis Adian Smith (SBN 274429)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA  90071.2452
Telephone: +1.213.489.3939
Facsimile:  +1.213.243.2539
asmith@jonesday.com

Attorneys for Petitioner
Lufthansa Technik AG

DANIEL MORRIS (*pro hac vice*)
danielmorris@eversheds-sutherland.com
EVERSHEDS SUTHERLAND (US) LLP
700 6th Street, N.W., Suite 700
Washington, DC 20001
Telephone: (202) 220-8348
Facsimile: (202) 637-3593

RONALD D. KENT (Bar No. 100717 )
ronald.kent@dentons.com
DENTONS US LLP
4675 MacArthur Court, Suite 1250
Newport Beach, CA 92660
Telephone: (949) 732-3700
Facsimile: (949) 732-3739

Attorneys for Respondent Thales Avionics, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

In the Matter of the Application of LUFTHANSA TECHNIK AG, Petitioner, for an Order Pursuant to 28 U.S.C. § 1782 to Take Discovery, Pursuant to the Federal Rules of Civil Procedure, of Respondent Thales Avionics, Inc., for Use in Foreign Proceedings

Case No. 8:19-mc-00016-UA-KES

**LOCAL RULE 37-2 JOINT STIPULATION REGARDING LUFTHANSA TECHNIK AG'S MOTION TO COMPEL THALES AVIONICS, INC.'S COMPLIANCE WITH SUBPOENA AND DEPOSITION NOTICE AND THALES AVIONICS, INC.'S MOTION FOR PROTECTIVE ORDER**

Hon. Judge Karen E. Scott

**Hearing Date**:  September 1, 2020
**Hearing Time**:  10:00 a.m.
**Location**:  Telephonic

45164448.1

# TABLE OF CONTENTS

I.      LUFTHANSA'S INTRODUCTION .................................................... 1

II.     THALES AVIONICS'S INTRODUCTION ............................................ 4

III.    DISPUTED DISCOVERY ............................................................... 8

A.     REQUEST 2 ................................................................................ 8

B.     REQUEST 3 .............................................................................. 16

C.     REQUESTS 4 AND 5 .................................................................. 26

D.     REQUEST 6 .............................................................................. 29

E.     REQUEST 7 .............................................................................. 31

F.     REQUEST 8 .............................................................................. 34

G.     REQUEST 9 (AND 12, TO THE EXTENT NOT DUPLICATIVE) ............. 36

H.     REQUESTS 10 AND 11 ............................................................... 37

I.      INFORMATION RELATING TO SPAIN AND JAPAN ............................ 41

J.     FRCP 30(B)(6) DEPOSITION ...................................................... 42

K.     COSTS OF MOTION ................................................................... 50

IV.    CONCLUSION .......................................................................... 55

A.     LUFTHANSA'S POSITION ........................................................... 55

B.     THALES' POSITION ................................................................... 56

45164448.1

Lufthansa Technik AG ("Lufthansa") and Thales Avionics, Inc. ("Thales Avionics") submit this Joint Stipulation pursuant to Local Rule 37-2 in connection with Lufthansa's Motion To Compel Thales to produce documents in accordance with the subpoena issued by the Clerk on July 8, 2019 (Decl. of A. Smith ISO Joint Stip. ("Smith Decl."), Ex. A, the "Subpoena") and to produce a witness in compliance with the Federal Rule of Civil Procedure 30(b)(6) notice of deposition served on September 19, 2019 (the "Deposition Notice") and Thales Avionics' Motion for Protective Order.

## I.   **LUFTHANSA'S INTRODUCTION**

1.      Lufthansa brought this action in June of 2019 to obtain discovery from Thales in aid of pending and reasonably contemplated proceedings in Germany, the United Kingdom, France, Spain, and Japan (the "Foreign Proceedings") under 28 U.S.C. § 1782.  In the Foreign Proceedings, including in France where Thales is a party, Lufthansa asserts its patent relating to electrical power supply systems. When this action commenced, Lufthansa's patent had already been held *valid and infringed* in Germany, entitling Lufthansa to damages from Thales' supplier, Astronics Advanced Electronic Systems ("AES"), dating back to December 2003. Decl. of G. Jaekel ISO Joint Stip. ("Jaekel Decl."), ¶¶ 3-5.

2.      Since then, in December 2019, the German court found that Lufthansa is entitled to damages for parts directly shipped by AES (on behalf of itself or another) into Germany (from Dec. 2003) and for parts that *indirectly* arrived in Germany (from Dec. 2007).  *See id.* at ¶¶ 4-5.  That decision includes damages for 110V systems that AES sold to Thales or another that were eventually assembled or installed in Germany.  *Id.* at ¶ 5.  The decision also required AES to account for all deliveries for parts that end up in Germany as well as *all* parts sold to entities like Thales who send *any* parts to Germany.  AES has failed to do so.  Lufthansa's two motions to compel against AES are pending in Germany.  *Id.* at ¶¶ 5, 7-8.  In June 2020, the UK court found Lufthansa's patent *valid and infringed*, entitling

1   Lufthansa to damages (from as early as Dec. 2011).  *See* Smith Decl., Ex. B, ¶ 5.

2   3.    Lufthansa is contemplating additional actions in the UK and Germany

3   following the most recent decisions in those jurisdictions, including potential

4   actions against Thales in those jurisdictions, as well as actions in Spain and Japan.

5   4.    The discovery that Lufthansa seeks here mainly relates to:  (a) the

6   liability (and extent of liability) of AES, Thales, and others for direct and indirect

7   infringement; (b) the damages due from AES, Thales, Safran, and others in the

8   Foreign Proceedings; and (c) the identification of other potential infringers.

9   5.    As a litigant granted relief under Section 1782, Lufthansa may "obtain

10  discovery as if [the Foreign Proceedings] had been brought in domestic court."  *In

11  re Bayerische Motoren Werke AG*, No. 19-mc-80272-VKD, 2020 WL 1865301, at

12  *1 (N.D. Cal. Apr. 14, 2020) (citing *Heraeus Kulzer, GmbH v. Biomet, Inc.*, 633

13  F.3d 591, 594, 597 (7th Cir. 2011)).  The applicable rules permit Lufthansa to

14  "obtain discovery regarding any nonprivileged matter that is relevant to any party's

15  claim or defense and proportional to the needs of the case."  Fed. R. Civ. P.

16  26(b)(1); *see also Heraeus Kulzer, GmbH*, 633 F.3d at 597 (discussing that once

17  discovery under Section 1782 is granted, "section 1782 drops out" and "the

18  ordinary tools of discovery management, including Rule 26, come into play"); *see

19  also Weber v. Finker*, 554 F.3d 1379, 1385 (11th Cir. 2009) (applying Rule

20  26(b)(1) to the Section 1782 discovery requests).  The discovery Lufthansa seeks

21  here meets that standard.

22  6.    Lufthansa' Subpoena and Deposition Notice are narrowly tailored to

23  the relevant and key issues of liability and damages in the Foreign Proceedings, and

24  the discovery is entirely proportional to the role and significant amount of Thales'

25  purchases and sales of parts at issue—hundreds of millions of dollars.[1]  Smith

26  Decl., ¶¶ 17-19, 21.  Lufthansa seeks the following outstanding information

27

28  [1] As explained further in Sections III.A-C, the amounts at issue are actually even larger.

regarding 110V in-seat power systems:  (1) purchases and sales (Reqs. 2 and 3); (2) purchase orders (Reqs. 4, 5, 10 and 11); (3) contracts (Req. 6); (4) statements of work (Req. 7); (5) specifications (Req. 8); (6) part numbers (Reqs. 9 and 12); (7) documents relating to AES's knowledge of the location or aircraft type where Thales intended to ship or install 110V in-seat power systems (Reqs. 10 and 11); and (8) a deposition of Thales on related topics under Fed. R. Civ. P. 30(b)(6).

7.     Lufthansa understands that this Court expected the parties to negotiate the most relevant and efficient scope of the Subpoena after discovery was granted on July 8, 2019.  And Lufthansa has attempted to do so for over a year.  Lufthansa offered multiple compromises, such as requesting that Thales produce sample agreements and purchase orders.  *See, e.g.*, Smith Decl., Ex. C, 8; Ex. E, 9-10.

8.     In spite of those offers, Thales' production remains deficient.  It produced only 48 documents consisting of its agreements with AES, associated amendments, and pricing correspondence; one statement of work; a handful of invoices; and spreadsheets showing some purchases and sales.  Lufthansa identified the deficiencies to Thales, including in letters in December 2019 and April 2020, (*id.* at Ex. C; Ex. E), and had numerous meet and confers and communications with Thales to narrow the dispute.  After its last production in November 2019, Thales continually represented that it would consider and substantively respond to Lufthansa's proposed compromises, but failed to do so for months.  *See id.* at ¶¶ 10-13.  In response to Lufthansa's April 14, 2020 letter, Thales would not substantively meet and confer until July 17, 2020.  *Id.* at ¶¶ 10, 15.  Now, after stringing Lufthansa along for months (*id.* at Ex. F; Ex. G; Ex. H), Thales refuses *any* further production, without any reasonable justification.  *See id.* at Ex. I; Ex. J, 1.  Thales cannot meet its "the burden to show that discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objection." *Oakes v. Halvorsen Marine Ltd.*, 179 F.R.D. 281, 283 (C.D. Cal. 1998).

9.     Similarly, the parties *did* in fact negotiate the most relevant and

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1

1   efficient topics for the Rule 30(b)(6) deposition.  Decl. of L. Rosenberg ISO Joint

2   Stip. ("Rosenberg Decl."), ¶¶ 3-6.  However, despite Thales' agreement to the

3   negotiated topics, Thales has not yet designated or provided a *knowledgeable*

4   *and/or sufficiently prepared* witness on the majority of the topics.  *Id.* at ¶¶ 7-10.

5       10.    Thales' tactics have wasted Lufthansa's time and resources over the

6   past eight months.  Lufthansa asks this Court to enforce the Subpoena and

7   Deposition Notice to help Lufthansa vindicate its rights in the Foreign Proceedings,

8   just as the Court would order discovery if Lufthansa's claims were brought in this

9   Court.  *See Heraeus Kulzer, GmbH*, 633 F.3d at 594.

10  **II.    THALES AVIONICS'S INTRODUCTION**

11      11.    Lufthansa initiated this miscellaneous discovery proceeding under 28

12  U.S.C. 1782 in June 2019, purportedly "to discover evidence [from Respondent

13  Thales Avionics, Inc.] to support its claim for damages from Astronics Advanced

14  Electronic Systems in the Pending European Proceedings"—a series of actions that

15  Lufthansa kicked off nearly a decade ago alleging infringement of a single

16  European patent relating to an electrical outlet that is off by default for safe use by

17  passengers on airplanes ("EP 145 Patent").

18      12.    As AES explained in its Motion to Intervene here, this 1782 discovery

19  action is at least the eighth of the proceedings comprising the broader Lufthansa-

20  AES airplane-outlet patent saga.  Lufthansa had previously brought actions

21  asserting infringement of the EP 145 Patent in each of Germany, the UK and

22  France, three 1782 discovery actions in the U.S., and a U.S. district court action

23  against AES in which Lufthansa asserted the U.S. counterpart to the EP 145 Patent.[2]

24  In the U.S. infringement action, the Western District of Washington entered

25  judgment against Lufthansa after finding each claim of the US Counterpart Patent

26  invalid for indefiniteness.  The U.S. Court of Appeals for the Federal Circuit

27

28      [2] U.S. Patent No. 6,016,016, herein after referenced as the "US Counterpart
Patent".

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

1     subsequently affirmed.

2          13.    Despite a decade passing since its first action concerning the EP 145

3     Patent, and despite that both the EP 145 Patent and its Japanese counterpart have

4     expired, Lufthansa also continues to claim that it is "reasonably" contemplating

5     even more litigation—including proceedings in Japan and Spain that Lufthansa has

6     been "reasonably" contemplating for more than nine years.[3]

7          14.    In this proceeding, Lufthansa represented in its 1782 application that it

8     had "narrowly tailored its discovery requests" and "seeks discovery from Thales to

9     establish the distribution chain through which the accused [AES] products are

10    offered for sale, sold and distributed, and to determine the volume of infringing

11    units sold in Germany and the other countries where Lufthansa holds patent rights

12    relating to the technology claimed in EP 145 Patent."  Dkt No. 1 ¶ 56.  But during

13    the course of all the other proceedings, Lufthansa has already obtained detailed

14    substantial discovery concerning AES's sales and distribution chain, including

15    thousands of documents and witness testimony in several depositions.  Dkt. No. 18

16    at 2, 3-4, 10.  And despite bringing the first action in this saga back in 2010 (Dkt.

17    No. 1 ¶ 2), and asserting claims for damages that date back to 2003 (*id*. ¶ 8),

18    Lufthansa waited until June 2019 to pursue discovery from Thales.

19         15.    It should surprise no one that Thales Avionics has had significant

20    turnover of employees and records during that time period and that, consequently,

21    knowledge of specific information about a few parts out of tens of thousands of

22    different parts that Thales Avionics has acquired from numerous suppliers over the

23    years is—at best—very limited.  *See* Morris Decl., ¶ 17, Ex. 6, 16:14-117:6; 50:0-

24    25.

25         16.    Nonetheless, Thales has in good faith worked with Lufthansa to

26

27          [3] See In re: LUFTHANSA TECHNICK AG, 2:11-cv-01386-JCC, Dkt. No. 1,
     Application for Discovery in Aid of Foreign Litigation Pursuant to 28 U.S.C. §
28    1782 at ¶ 5 (W.D. Wash. July 22, 2011).  Morris Decl., ¶ 22, Ex. 11.

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1

1   prepare several reports from its database tailored to specific requests from

2   Lufthansa, and has provided testimony explaining that information in three

3   depositions and multiple declarations.  Morris Decl., ¶¶ 13-19, Exs. 3-10.  But, as

4   AES forewarned during the hearing on its Motion to Intervene (*see* Dkt. No. 38 at

5   40:13 – 41:23) , with Lufthansa, it is never enough.

6       17.    Lufthansa has agreed several times to narrow its requests in exchange

7   for Thales immediately and urgently producing certain information, and based on

8   those agreements, Thales has-at significant expense-gone back to hunt for

9   information sought by Lufthansa, prepare-outside the ordinary course at

10  Lufthansa's request-spreadsheets with such information, search for individuals who

11  might have any remaining knowledge about the information, and offer testimony

12  from three witnesses at three depositions. Morris Decl., ¶¶ 7-19, Exs. 5-7. But

13  Lufthansa has welched every time, repeatedly coming back demanding more from

14  Thales than it had already agreed to accept.  Morris Decl., ¶¶ 12, 23, Ex. 12.

15      18.    Rather than be open and frank with Thales Avionics about the

16  information it wants so that Thales Avionics can track down those details and

17  prepare its designated witnesses to be able to address those details at deposition,

18  Lufthansa has, without forewarning, chosen to ambush Thales Avionics witnesses

19  with documents obtained from other sources, asked about specific details that no

20  witness could be expected to remember, and then declared Thales's witnesses

21  unprepared.  Morris Decl., ¶ 16, Ex. 5, 167:12-177:7; *see also id.,* ¶ 19, Ex. 8, ¶¶ 4-

22  5.

23      19.    Given this type of conduct, it appears that Lufthansa is intent on just

24  keeping this proceeding open on the Court's docket throughout Lufthansa's

25  ongoing and seemingly never ending adventures in the European courts.

26  Lufthansa's and its counsel's conduct is in violating of their discovery obligations

27  under the Federal and this Court's Local Rules, has unreasonably and vexatiously

28  multiplied these proceedings, and caused Thales Avionics to incur significant

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

1   expense at a time when it is suffering from the devastating economic impact of

2   COVID-19 on the aviation industry.

3       20.     This is not the first time Lufthansa's use of the 1782 process in

4   connection with the power outlet patent saga has been out of bounds.  For example,

5   the Western District of New York previously denied a 1782 petition from Lufthansa

6   brought in that court because Lufthansa already had a duplicative 1782 proceeding

7   pending in the Western District of Washington.  *Lufthansa Technik AG v. Astronics*

8   *Corporation*, No. 11–CV–628A, 2011 WL 3957509, at **2-3. The Court found the

9   discovery sought unnecessarily broad, unduly burdensome and not clearly relevant,

10  and thus rejected some of the requests in their entirely, and modified the remainder

11  by narrowing the substantive and temporal scope.  *Lufthansa Technik v. Panasonic*

12  *Avionics Corp.*, No. C17-1453-JCC, 2017 WL 6311356, at **5-6 (W.D. Wash.

13  Dec. 11, 2017).

14      21.     Importantly, § 1782 authorizes, but does not require, federal district

15  courts to assist in the production of evidence for use in a foreign or international

16  tribunal.  *Khrapunov v. Prosyankin*, 931 F.3d 922, 932 (9th Cir. 2019).  Even where

17  an applicant satisfies § 1782's statutory prerequisites, the district court still retains

18  substantial discretion to permit or deny the requested discovery. *In re Pioneer*

19  *Corp. for an Order Permitting Issuance of Subpoenas to Take Discovery in a*

20  *Foreign Proceeding*, No. MC 18-0037 UA (SS), 2018 WL 2146412, at *7 (C.D.

21  Cal. May 9, 2018).  And discovery under § 1782 is, by the statute's own terms,

22  generally subject to the Federal Rules of Civil Procedure. *Id.* at *8. Thus, § 1782

23  discovery must be limited when—as is the case here—the discovery sought is (i)

24  unreasonably cumulative or duplicative, or is obtainable from some other source

25  that is more convenient, less burdensome, or less expensive; or (b) the burden or

26  expense of the proposed discovery outweighs its likely benefit, taking into account

27  the needs of the case, the amount in controversy, the parties' resources, the

28  importance of the issues at stake in the litigation, and the importance of the

proposed discovery in resolving the issues.  Fed. R. Civ. P. 26(b)(2).

22.    Thales Avionics has already gone above and beyond by accommodating Lufthansa's repeated "urgent" demands by creating new spreadsheets with the information specifically requested by Lufthansa, and providing testimony from three witnesses at deposition and through declarations. But Lufthansa has held up and dragged out this 1782 action by constantly abandoning its agreements, moving the target and demanding information that does not exist.  Enough is enough.

23.    Thales respectfully requests that the Court (i) deny Lufthansa's request for an Order compelling discovery and awarding costs, (ii) deem Thales's obligations under the subpoena and this 1782 proceeding fully satisfied, and (iii) terminate this action, subject to the Court retaining jurisdiction to enforce the Protective Order and to hear a motion for an award of fees, expenses and costs filed by Thales within twenty-one (21) days of the Court's ruling on the issues raised in this Joint Stipulation.

## III.   **DISPUTED DISCOVERY**

### A.    **REQUEST 2**

Documents, including, but not limited to purchase orders, offers, returns, repairs, specifications, and statements of work, sufficient to show for each year since the first purchases by Thales of Astronics' 110V in-seat power systems[4] for installation in Airbus, Boeing, Bombardier, or Embraer aircraft in the United Kingdom, France, Spain, Germany or Japan, or in the aircraft of any other aircraft manufacturer in those countries, the number of units received by Thales from Astronics, the prices paid and/or other compensation provided by Thales to

---

[4] "110V In-Seat Power Systems" are defined to mean "those power supplies and all parts thereof including outlet sockets, power supplies, master control units, electronic controls such as in-seat power supplies or seat power boxes and other electronic parts, connections, and/or spare parts that are (a) suitable for providing an alternating current supply with 110V or more, (b) licensed to be used in the passenger cabin of an aircraft, and (c) offered, imported, owned, sold, or brought into circulation by AES.  This definition expressly includes any modifications, adjustments, or re-designs of any such power system from the date the system was introduced to the present."  Smith Decl., Ex. A, 4.

Astronics for those units, and for each part shipped into the specified countries, the shipment date, the shipping addresses, including the address of respective warehouses or storage facilities, order addresses, ordering entity, invoice number, invoice number of AES, the entity who was the seat manufacturer, the entity who was the ultimate customer, the aircraft upon which each was installed by specific type, specific type of aircraft for which the part was approved by the FAA, EASA or other national authority, the AES part number, Thales part number, the modification level of the part, the geographical location of installation, whether it was a retrofit or a linefit; and whether each part is "suitable for providing an alternating current supply with 110V or more, including any returns, repairs or free samples.

## 1.   **Lufthansa's Position**

24.     Request 2 relates to information about Thales' **purchases** from AES, which are relevant to AES's liability for indirect infringement and indirect deliveries to the countries in the Foreign Proceedings, damages due from AES, Thales' liability for infringement, and potential damages from Thales.  For instance, the prices Thales paid are required to show AES's infringing sales, AES's profits, and Thales' profits.  The various categories of requested information about each shipment are also highly relevant to issues such as:  the time and location where parts were sent or later arrived, invoice numbers to cross check data, intended aircraft for installation (as the final assembly of certain aircraft only takes place in certain countries at issue[5], and thus infringing parts necessarily enter those countries), and the part numbers and models sold (and the extent of infringement). Lufthansa requests that Thales be ordered to provide the requested information for all purchases of 110V in-seat power systems, including components thereof and periphery parts[6] from December 2003 to present.

---

[5] For instance, the Airbus A380 is assembled only in Germany and the A350 is assembled only in France.  Jaekel Decl., ¶ 11.

[6] Components and periphery parts are included in the definition of 110V in-seat power systems, and are relevant to infringement.  For instance, the German judgment includes all periphery parts (judgment District Court of Mannheim, docket no. 7 O 1/18, no. 4: "with regard to the products which the defendant offered or placed on the market together with the above-mentioned power supply system, in particular In-Use-Lights, cable connections to the In-Use-Light, coverings for sockets, ground wires, configuration modules, cable extensions and termination plugs").  Jaekel Decl., ¶ 6.

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1

25.     While Thales provided some information about purchases from AES, Thales has not yet produced information sufficient to identify all requested purchases from AES and has not provided all relevant categories of information for each purchase.  Because of the large monetary amount of purchases that are implicated by this request, the discovery more than meets the standards for proportionality under Rule 26.

26.     Lufthansa has been informed that Thales is AES's second largest customer, making up a significant portion of the actual and potential damages in the Foreign Proceedings.  Thales' productions to date, which appear to be seriously flawed, already show purchases of at least ▮▮▮▮▮ in relevant parts from AES.  But there are still omissions in Thales' purchase information, which should be addressed and supplemented.

27.     **Gap in time:**  For example, Thales' has not provided information on any purchases with invoice dates from December 2003 to August 26, 2008, or from July 2015 due to gaps in its production.  Its spreadsheets only show purchases from AES with invoice dates from August 27, 2008 to June 19, 2015 and then from August 2015 to August 2019.  Smith Decl., ¶ 18.

28.     **Missing parts (based on known part numbers):**  Further, there are numerous part numbers that Thales contracted to buy from AES, as shown in the parties' agreements[7], yet Thales has not provided any information regarding purchases of those parts.  For instance, Thales agreement with AES lists parts 181622-201 and 181911-301 for purchase from AES, yet there are no such purchases in Thales' production.  *Id.* at ¶ 22.

29.     Similarly, there are part numbers (*e.g.*, ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) in

---

[7] As set forth in Section III.G., *infra*, Thales has not yet produced all lists of parts purchased from AES, so there may be many more parts missing from Thales' production.

Thales' two example forecasting documents provided to AES that are not reflected in the purchases spreadsheets. *Id.* at ¶ 23.

30.     And, there are relevant part numbers shown on the one statement of work provided, which identifies three specific part numbers Thales purchased from AES in connection with the 110V in-seat power supplies. *Id.* at Ex. L, p. 1 ("Subject" citing parts ███████████████████████). However, part number ████████ does *not* appear in Thales' produced purchase information. *Id.* at ¶ 24. Thales' Rule 30(b)(6) deponent claimed that the Thales produced spreadsheets of purchases from AES were not filtered by any part numbers. *Id.* at Ex. P, ¶ 8. Thus, there are obvious flaws in the production, which Thales has not been able to explain.

31.     **Missing fields of information:** Thales' production of purchase information is also missing certain relevant categories of information about each purchase, the relevance of which are summarized in the chart below:

| Information | Relevance | Omissions |
|---|---|---|
| the shipping addresses, including the address of respective warehouses or storage facilities | Infringement liability | Missing from 2007-2015 |
| order addresses | Infringement liability | Missing from 2007-2015 |
| ordering entity | Infringement liability – identity of infringers | Missing |
| invoice number of AES | Verify and cross reference information | Missing from 2015-2019 |
| the entity who was the seat manufacturer | Infringement liability | Missing |
| the entity who was the ultimate customer | Infringement liability | Missing |
| the aircraft upon which each was installed by specific type | Infringement liability (*e.g.*, a linefit installation for an A380 indicates infringement in Germany and a | Missing |

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1

| Information | Relevance | Omissions |
|---|---|---|
| | linefit for an A350 indicates infringement in France) | |
| specific type of aircraft for which the part was approved by the FAA, EASA or other national authority | Infringement liability - If the actual aircraft is unknown, this information is relevant to determining where the parts where potentially installed | Missing |
| the AES part number | Infringement liability – *e.g.*, to pair the shipment with technical documents and data from AES | Missing |
| the modification level of the part | Infringement liability – Necessary to determine infringement (modified Outlet Unit) and to assess technical features of the part (each mod. changes the part) | Missing |
| the geographical location of installation | Infringement liability | Missing |
| whether it was a retrofit or a linefit | Infringement liability – *e.g.*, a retrofit Boeing may be relevant as well as a linefit Airbus given the respective assembly locations | Missing |
| whether each part is "suitable for providing an alternating current supply with 110V or more" | Infringement liability | Missing |

32.     That missing information is critical to determining infringement liability in the various jurisdictions.

33.     **Thus, given the large amount at stake, Thales should be required to promptly supplement and/or reproduce its purchases from AES to cure these deficiencies including by providing:  (a) purchases from AES from December 2003 to August 27, 2008 and in July 2015; (b) purchases of known AES part numbers that are not on the current spreadsheets; and (c) the following missing information regarding each shipment:  the shipping addresses, including the address of respective warehouses or storage facilities; order addresses; ordering entity; invoice number of AES; the entity who was**

45164448.1

**the seat manufacturer; the entity who was the ultimate customer; the aircraft upon which each was installed by specific type; specific type of aircraft for which the part was approved by the FAA, EASA or other national authority; the AES part number; the modification level of the part; the geographical location of installation; whether it was a retrofit or a linefit; whether each part is "suitable for providing an alternating current supply with 110V or more."**

### 2. Thales' Position

34. As Thales Avionics asserted in its timely objections to the Subpoena (Morris Decl., ¶5, Ex. 1), Request No. 2 is vague, unduly burdensome, and intrusive. It purports to require Thales Avionics to identify documents sufficient to disclose eighteen disparate facts as to "each part" shipped into five different countries and going back as far as nearly sixteen years. It further purports to require Thales Avionics to report the number of undefined "units" received by Thales Avionics from AES and the compensation paid therefor, which information is more readily available from other sources, including AES.

35. Lufthansa subsequently requested that in responding to Request 2, Thales Avionics prepare a spreadsheet using data pulled from its parts and sales database. Lufthansa specifically acknowledged that not every data field listed in the request was necessary nor even feasible. Lufthansa also acknowledged that the type of spreadsheet report that Lufthansa sought is not something Thales Avionics prepares in the ordinary course of its business and that Thales Avionics staff were being asked to do something they had never done before. Nonetheless, Thales Avionics agreed prepare a spreadsheet with data from its parts and sales database, and worked in good faith with Lufthansa in an effort to understand and identify the information that Lufthansa needed and determine what information was available in its databases.

36. Those initial spreadsheets included every payment to AES without filtering for specific parts that Lufthansa may allege are infringing.

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1

37.     Importantly, Lufthansa has persistently refused to identify each of the specific AES parts that Lufthansa alleges infringe its patent. To-date Lufthansa has insisted that it is incapable of identifying—and suggested that it was Thales Avionics' responsibility to attempt to identify—the specific AES parts that Lufthansa accuses. (As discussed below, Lufthansa later agreed that a list of at least some of the specific AES parts it had identified as infringing could be used by Thales Avionics to prepare the second iteration of the spreadsheets.)

38.     Nonetheless, Thales Avionics accepted the compromise of preparing spreadsheets because of the extraordinary burden of otherwise attempting to identify "[d]ocuments … sufficient to show" the twenty or more facts about transactions involving vaguely-described AES components over the course of a more than 10-year period in five continents.

39.     Thales Avionics went above and beyond its discovery obligations by working with Lufthansa to create entirely new documents to supply Lufthansa with the information it sought in a uniquely accessible format. Thales Avionics further, in ongoing consultation with Lufthansa, subsequently agreed to revise those spreadsheets in response to Lufthansa's requests, to provide the specific information that Lufthansa sought, and also agreed to make efforts to produce that new iteration of spreadsheets on an expedited timeline in response to Lufthansa claiming an urgent, time-sensitive need for that information. Morris Decl., ¶¶ 9, 12, 13-14.

40.     These spreadsheets demonstrate how slight Thales Avionics' connection to this litigation is and how disproportionate the burden of Lufthansa's demands in this 1782 proceeding have been on Thales Avionics. In France, Germany, and the United Kingdom, using the AES part numbers that Lufthansa identified as most relevant, the total volume—dating back as far as Thales Avionics databases include relevant records—is approximately ███████.

41.     Lufthansa's complaints about purported "gaps in time" are

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1

disingenuous. Any Thales Avionics purchases entered into its databases were reported. Out of an overabundance of caution to ensure no transactions in 2003 were missed, the data request included records back to 2001. There is nothing unusual about Thales Avionics having no significant purchase volume until 2008, given Thales Avionics did not entered into a purchase agreement with AES until 2007. Morris Decl., ¶ 13, Ex. 4, ¶ 12. If the transaction is in the database, it is in the report. *See* Morris Decl., ¶16, Ex. 5, 167:12-177:7. If there were no responsive transactions for a month, then none are reported for that month.

42.    Lufthansa's "missing parts" allegations are also hollow. A contractual right or initial plans to purchase one of many parts does not guarantee that that specific part will be purchased.

43.    Thales Avionics has been fully transparent in its methodology of how the spreadsheets were prepared. Its first iterations of spreadsheets sought breadth to seek to avoid omitting information that Lufthansa represented it needed on short notice and about which it could provide little guidance. Morris Decl., ¶ 13, Ex. 3. As a result, every AES part billed-to or shipped-to the named jurisdictions was identified in a spreadsheet with thousands of lines of data. Likewise, unable at the time to break out payment to AES related to specific jurisdictions, Thales provided information related to the entire globe, from which Lufthansa could attempt to estimate sales to jurisdictions to meet its urgent needs.

44.    When Lufthansa returned and said that additional time was available and requested changes to the spreadsheets, Thales Avionics worked to accommodate Lufthansa. When provided Thales Avionics a list of specifically identified AES parts prepared by Lufthansa from which to work, Thales Avionics was able to use that list to identify not only AES parts that Thales Avionics sold but those Thales Avionics assemblies that incorporated those AES parts and sales of those assemblies. Morris Decl., ¶ 19, Ex. 8, ¶ 6.

45.    Significantly, the initial spreadsheets included every payment to AES

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1

1   without filtering for specific parts that Lufthansa may allege are infringing, while

2   the revised spreadsheets filtered for the parts identified by Lufthansa and for

3   geography. As a result, the volume between AES and Thales Avionics shown in the

4   initial spreadsheets does not evince anything specifically about purchases of

5   allegedly infringing parts. The volume of purchases of alleging infringing parts is

6   much smaller as demonstrated in the second iteration of spreadsheets, which were

7   prepared after Lufthansa agreed to identify some of the specific AES parts it alleges

8   infringe its patent.

9       46.     However, Thales Avionics has from the beginning told Lufthansa that

10  incorporating all of the fields of information listed in its request was not feasible.

11  *See* Morris Decl., ¶ 16, Ex. 5, 45:5-46:1. Lufthansa responded by acknowledging

12  that there would necessarily be limitations and that they were willing to work with

13  those limitations.

14      47.     In sum, Thales Avionics has provided extraordinary assistance to

15  Lufthansa—custom crafting reports to assist, in ways entirely out of the ordinary

16  course, and often on expedited timeframes because of some urgent deadline in a

17  foreign proceeding that Lufthansa had only recently learned of. This is a poorly

18  crafted discovery request that—on its face—does nothing to minimize the burden

19  on the producing party. If Lufthansa's proposed spreadsheet solution to the problem

20  Lufthansa created with the poorly crafted discovery request was disappointing,

21  Lufthansa should fairly bear the burden of that disappointment.

22  **B.    REQUEST 3**

23      Documents, including, but not limited to purchase orders, offers, returns,
    repairs, specifications, and statements of work, sufficient to show for each year

24  since the first purchases by Thales of Astronics' 110V in-seat power systems for
    installation in Airbus, Boeing, Bombardier, or Embraer aircraft in the United

25  Kingdom, France, Spain, Germany or Japan, or in the aircraft of any other aircraft
    manufacturer in those countries, the number of units purchased by customers from

26  Thales, the prices paid and/or other compensation provided by the customers for
    those units, and for each part shipped into the specified countries, shipment date,

27  the shipping addresses, including the address of respective warehouses or storage

28

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1

facilities, order addresses, ordering entity, seat manufacturer, invoice number, invoice number of AES, the entity who was the ultimate customer, the aircraft upon which each was installed by specific type, specific type of aircraft for which the part was approved by the FAA, EASA or other national authority, the AES part number, Thales part number, the modification level of the part, the geographical location of installation, whether it was a retrofit or a linefit; and whether each part is "suitable for providing an alternating current supply with 110V or more" , including any returns, repairs or free samples.

### 1. **Lufthansa's Position**

48.     Request 3 relates to information about Thales' **sales** of in-seat power systems, which are relevant to AES's liability for indirect infringement and indirect deliveries to the countries in the Foreign Proceedings, damages due from AES and other downstream entities, liability of other potential infringers, Thales' liability for infringement, and potential damages from Thales.  For instance, the prices customers paid to Thales are relevant to Thales' profits and the shipment addresses and location of installation are relevant to infringement liability.  The various categories of requested information about each shipment are also highly relevant to issues such as:  the time and location where parts were sent or later arrived, invoice numbers to cross check data, intended aircraft for installation (as certain aircraft are only built in certain countries at issue, and thus necessarily enter those countries), and to the part numbers and models sold (and the extent of infringement). Lufthansa requests that Thales be ordered to provide the requested information for all sales of 110V in-seat power systems, components thereof, and periphery parts from December 2003 to present.

49.     While Thales provided some sales information, there are significant discrepancies and omissions that could impact the sales figures by an order of magnitude or more.  Because of the large monetary amount of sales that are implicated by this request, the discovery more than meets the standards for proportionality under Rule 26, and Thales should supplement its production with complete information.

50.     Thales' production to date also shows sales of approximately 100,000

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1

1   infringing and potentially infringing parts that exceed ███████ dollars to just

2   three of the five countries from December 2007 to August 2015 alone. *See, e.g.*,

3   Smith Decl., ¶ 19. And, Thales' production of "AEO Confidential SAP Astronics

4   Parts" shows another █████ units of sales from August 2015 to 2019, just to

5   Germany, the United Kingdom, and France, for which sale prices have not been

6   disclosed (*see id.*), but could easily constitute another ████████ or more in sales.

7   Thales should be required to produce the dollar value of those sales from August

8   2015 to 2019, as opposed to just the number of units.

9        51.    Furthermore, Lufthansa has noted a number of deficiencies, including

10   missing sales of known AES part numbers, missing sales to Northern Ireland (part

11   of the United Kingdom), missing sales to known customers, missing sales by

12   aircraft type[8], and missing sales by country of destination[9]; but Thales has not yet

13   explained any of these deficiencies.

14        52.    **Missing sales to Northern Ireland, part of the United Kingdom:**

15   Thales's production of sales from August 2015 to 2019 relating to the United

16   Kingdom show only "GB" or "GBR" as the country of shipment, whereas other

17   spreadsheets indicate sales to Northern Ireland are tracked as "NRI." Northern

18   Ireland is the location of several internationally important seat manufacturers who

19   purchase IFEs (*e.g.*, BE Aerospace and Thomson Aero), yet there are no reported

20   sales to this country code.

21        53.    **Missing sales to known customers:** It is evident that Thales'

22   production of sales is seriously flawed, as it omits sales that went to one of the

23   relevant countries as shown on its own shipping documents or invoices that

24   Lufthansa obtained from a Thales customer in Germany. In particular, there are 12

25   part numbers on the invoices and shipping documents attached as Smith Decl., Ex.

26

27        [8] *See also* Request 4, relating to sales by aircraft type. Section III.C., *infra*.

28        [9] *See also* Request 5, relating to sales by relevant country of installation. Section III.C., *infra*.

D, that are known to be in-seat power parts that Thales purchases from AES. *Id.* at ¶ 6. It should also be noted that such part numbers are necessarily specific to the AES purchased parts, and cannot be used by Thales for parts coming from other suppliers, because all part numbers are unique and are individually approved by aviation authorities like the Federal Aviation Administration for a given part and manufacturer. *Id.* at ¶ 7. Of those 12 entries of AES parts on just three shipping documents, there are prices listed for five of the part numbers. Just these five missing entries exceed $280,000 in value (*id.* at ¶ 6), showing that the omission of just a handful of sales could alter the damages base by hundreds of thousands of dollars.

54. Lufthansa provided these three example shipping documents to Thales on January 30, 2020, so that Thales could explain the missing sales from its spreadsheets. Thales informed Lufthansa that it would investigate the issue. However, seven months later, Thales refuses to even confirm that these are AES parts (even though those part numbers cannot be assigned to any other parts), and has taken the position that even investigating the discrepancy is too burdensome. *See id.* at Ex. K, 2.

55. What is worse, Thales tries to distort this *deficiency* into an opportunity to prove the *sufficiency* of its production. Because there were many other parts that are not at issue on those three sample invoices, Thales represented to Lufthansa during a meet and confer that they believe only 12 missing parts out of the full list of 400 parts (which included non-AES parts), shows a 3% error rate that Thales touted as proof positive of its reporting. This red herring is a total misrepresentation. Lufthansa provided just three example shipping documents with sales of 12 known AES part numbers; Thales has no explanation as to why any of those 12 parts are missing. That is a **100%** error rate based on those three shipping documents alone, and the sale of just a few parts implicates an error of hundreds of thousands of dollars.

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

56.     As another example, Thales' own website indicates that as of June
2014, Air France (headquartered in France[10]) "is equipping all of its A380 fleet"
with Thales' IFE system[11], which contain AES 110V in-seat power systems.[12]   *See
also id.* at ¶ 25.  However, Thales' production does not identify any sales to Air
France.  *Id.*

57.     **Missing sales of known AES parts that Thales purchased:**  There
are numerous part numbers that Thales contracted to buy from AES, as shown in
the parties' agreements, yet Thales has not provided any information regarding
sales of those parts.  For instance, there are no reported sales or shipments for the
following part numbers: ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████          *Id.* at ¶ 26.

58.     **Missing sales by aircraft type:** Thales has not yet provided
information regarding all sales intended to be installed in aircraft types that are built
in the relevant countries (*i.e.*, Airbus aircraft, A220, A300, A310, A318, A319,
A320, A321, A330, A340, A350, A380).[13]  For instance, Thales may sell its part to
a customer outside of the five relevant countries and ship that part to, for example, a
seat manufacturer outside of the five countries, in which case Thales did not
produce information about the sale.  However, if that part is listed as being made to
supply an Airbus A380, then it is known that the Thales customer or the seat
manufacturer (which may be one in the same) will necessarily forward the
assembled seat with the infringing system to Germany because the A380 is only

---

[10] https://www.airfrance.com/BH/en/common/faq/about-air-france/where-is-air-france-headquarters.htm

[11] https://www.thalesgroup.com/en/worldwide/aerospace/news/airbus-a380-and-thales-partnership-success

[12] https://airlinesfleet.com/air-france-fleet-airbus-a380-800-details-and-pictures/ (indicating that "AC Power. Power is available only in La Première, Business, and Premium Economy class.").

[13] *See also* Request 4 at Section III.C., *infra*.

45164448.1

assembled in Germany.  Jaekel Decl., ¶ 11. Once the system enters Germany it infringes in Germany.  Given the number of seat manufacturers in the United States, and in other countries outside of the five relevant countries at issue here, this omission could constitute a large volume of sales.

59.    **Missing sales by Country of Destination:**  Nor has Thales provided sales data based upon the listed Country of Destination in its shipping documents, an example of which is shown below indicating a destination country of Japan.



Smith Decl., Ex. D, p. 51 (sales order 200002263 at p. 15 of 16).

60.    As mentioned, it is common practice within the industry for an IFE-vendor like Thales to ship parts directly to the seat manufacturer, who then assembles the parts within the seat and ships the manufactured seat to the aircraft manufacturer (*e.g.*, Airbus) or other customer (such as a retrofitting entity), who then installs the seat in the aircraft.  Jaekel Decl., ¶ 12.  On information and belief, that final installation location is provided by Thales' customers and is listed as the "Destination Country" on Thales' shipping documents.  *Id.*  For instance, Thales may sell 110V in-seat power system parts from AES to a Chinese airline (*e.g.*, Air China), but ship these parts to a seat vendor in Italy (*e.g.*, Aviointeriors S.p.A.) for assembly within the respective passenger seats.  *Id.*  The seat manufacturer then forwards the seats with the in-seat power system to an aircraft manufacturer (*e.g.*, Airbus) to be installed in an A380 in Hamburg, Germany or a retrofit center in one of the relevant countries.  *Id.*  It is apparent from the face of the shipping documents seen that Thales has this information regarding relevant sales, yet Thales has refused to produce it.

61.    **Inconsistencies Within Thales Produced Data:**  Thales provided two

spreadsheets that indicate sales of over ▓▓▓▓ AES parts to the relevant countries between 2008 and 2019.  Smith Decl., ¶ 19.  Thales claims these were not limited by part number.  *See, e.g.*, *id.* at Ex. P, ¶ 8.  Thales has also provided six more targeted spreadsheets (two for each of the UK, France, and Germany) that purport to be sales of the Lufthansa provided AES part numbers (*i.e.*, a subset of all AES part numbers) to Germany, France, and the UK.  *See id.* at ¶ 20.  However, those targeted spreadsheets actually show purchase orders of AES parts that are missing from the original-unrestricted spreadsheets, raising doubt as to the reliability of the produced data.  *See id.*

      62.   **Missing fields of information:**  Thales production of sales information is also missing certain relevant categories of information about each sale, the relevance of which are summarized in the chart below:

| Information | Relevance | Omissions |
|---|---|---|
| prices paid or other compensation | Damages | Missing from 2015-2019 |
| the shipping addresses, including the address of respective warehouses or storage facilities | Infringement liability | Missing with respect to warehouses and storage facilities |
| invoice number of AES | Verify and cross reference information | Missing |
| the entity who was the seat manufacturer | Infringement liability | Missing |
| the entity who was the ultimate customer | Infringement liability | Missing |
| specific type of aircraft for which the part was approved by the FAA, EASA or other national authority | Infringement liability - If the actual aircraft is unknown, this information is relevant to determining where the parts where potentially installed | Missing |
| the AES part number | Infringement liability – *e.g.*, to pair the shipment with technical documents and data from AES | missing |
| the modification level of the | Infringement liability – Necessary | Missing |

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1

| Information | Relevance | Omissions |
|---|---|---|
| part | to determine infringement (modified Outlet Unit) and to assess technical features of the part (each mod. changes the part) | |
| the geographical location of installation | Infringement liability | Missing |
| whether it was a retrofit or a linefit | Infringement liability – *e.g.*, a retrofit Boeing may be relevant as well as a linefit Airbus given the respective assembly locations | Missing |
| whether each part is "suitable for providing an alternating current supply with 110V or more" | Infringement liability | Missing |

63.     **Thus, given the large amount at stake, Thales should be required to promptly supplement and/or reproduce its sales information to cure these deficiencies including by providing:  (a) the prices paid and/or other compensation from the sales of AES parts from 2015 to 2019 in "AEO Confidential SAP Astronics Parts"; (b) the missing sales of known AES part numbers; (c) the missing sales to Northern Ireland; (d) the missing sales to known customers; (e) the missing sales by aircraft type; (f) the missing sales by country of destination; and (g) the following missing information regarding each shipment:  prices paid or other compensation as of 2015; the shipping addresses, including the address of respective warehouses or storage facilities; invoice number of AES; the entity who was the seat manufacturer; the entity who was the ultimate customer; specific type of aircraft for which the part was approved by the FAA, EASA or other national authority; the AES part number; the modification level of the part; the geographical location of installation; whether it was a retrofit or a linefit; whether each part is "suitable for providing an alternating current supply with 110V or more."**

2.     **Thales' Position**

45164448.1

64.    As Thales Avionics asserted in its timely objections to the Subpoena Morris Decl., ¶5, Ex. 1), Request No. 3 is vague, unduly burdensome, and intrusive. It purports to require Thales Avionics to identify documents sufficient to disclose eighteen disparate facts as to "each part" purchased by customers in five different countries and going back as far as more than 15 years ago.

65.    After meet and confer discussions, Thales Avionics accepted Lufthansa's compromise offer that Thales Avionics provide spreadsheets with information from its parts and sales database in response to Request No. 3. Lufthansa has routinely struggled to accept the information that Thales Avionics has provided to them—in large part because Lufthansa has been unable to articulate which AES parts it believes are infringing and unable to accept that Thales Avionics has other vendors for some of these parts.

66.    The first iteration of spreadsheets that Thales Avionics produced to Lufthansa were as global as possible because Thales Avionics was still working to determine its ability to filter this information to better meet Lufthansa's needs and also trying to ensure transparency of process.

67.    Consequently, the initial sales spreadsheet included all AES part numbers and did not attempt to filter for only those parts Lufthansa alleges infringe. Thus, Lufthansa's use of the sales volume reported in that spreadsheet is misleading. As noted above, Thales Avionics later prepared a spreadsheet with the available data for the parts in the list provided by Lufthansa (and those assemblies incorporating those parts), which resulted in a sales volume to France, Germany, and the United Kingdom of approximately ███████████

68.    Secondly, and as described above, during one of the depositions of Thales Avionics's designees, Lufthansa chose to waste everyone's time by attempting a "gotcha" moment in what appears to have been an effort to prove up their doubts about the reliability of the spreadsheets. Morris Decl., ¶ 16, Ex. 5, 167:12-177:7. Lufthansa confronted the witness with a single shipping document

from May 2010 that the witness had not previously seen because Lufthansa had obtained it in another proceeding and had chosen not to disclose it to Thales Avionics before the deposition. *Id.* Lufthansa then asked the witness to explain why the items on the shipping document were not in the spreadsheet. *Id.* Not surprisingly, the witness could not at that moment investigate the shipping document or to search Thales Avionics's database for any information that might relate to the shipping document, but the witness stood by the reliability of the spreadsheet. *Id.* Sure enough, after investigating the matter when he returned to the office, the witness confirmed that all of the parts on that shipping document had been supplied by other vendors—they were not AES parts and therefore did not belong on the spreadsheets. Morris Decl., ¶ 19, Ex. 8, ¶¶ 4-5.

69.     Nonetheless, Lufthansa still refused to accept the spreadsheets. In a good faith effort to address Lufthansa's purported doubt, and close out its response to this request, Thales Avionics agreed to test the spreadsheets again against three exemplar shipping documents. Lufthansa dug up three of the largest shipping documents it could find. Of the nearly 400 entries Lufthansa asked Thales Avionics to check, Thales Avionics has already confirmed that no more than 12 could potentially refer to AES parts. The vast majority of the entries—approximately 97%—were for parts from suppliers other than AES, suggesting Lufthansa fundamentally misapprehended the circumstances of the market. While Lufthansa now asserts that it meant only to test those specific twelve entries, that is not the language of the email that transmitted those near-400 entries, and it also does not explain the earlier failure of Lufthansa's "gotcha" moment shipping document at the deposition.

70.     Even in the best filing systems or databases, there will occasionally be data errors. Thales Avionics' concern and its experience here is that anything less than perfect or less than 100% will be used by Lufthansa to demand further burdensome efforts by Thales Avionics. In the usual plenary action, each party has

45164448.1

1   an incentive to recognize reasonable limits and standards as they may face those

2   same limits and standards imposed against it. Here, Lufthansa lacks that useful

3   dynamic and the restraint it imposes.

4       71.    Lufthansa seems less interested in reviewing and using the information

5   than in finding some fault with it. Indeed, ***almost six months after the first***

6   ***spreadsheets were produced***, Lufthansa abruptly complained that sales or

7   shipments to Northern Ireland were not included and demanded revised

8   spreadsheets that incorporated this information as well.

9       72.    Here, again, Lufthansa complains of missing fields, but the same

10   history applies and the same compromise was struck. Thales Avionics made the

11   effort, in extraordinary circumstances, to create a new document in consultation

12   with Lufthansa. Thales Avionics should not be required to produce further,

13   particularly in light of the disproportionality of this discovery.

14   ## C.    REQUESTS 4 AND 5

15       Request 4 - Documents, including but not limited to purchase orders, offers,

16   returns, repairs, specifications, and statements of work, sufficient to show, for each

17   year since the first purchases by Thales of Astronics' 110V in-seat power systems

    for installation in Airbus, Boeing, Bombardier, or Embraer aircraft in the United

18   Kingdom, France, Spain, Germany or Japan, or in the aircraft of any other aircraft

    manufacturer in those countries, the number of units sold that were or would be

19   installed in each aircraft type, including any returns, repairs or free samples.

20       Request 5 - Documents, including but not limited to purchase orders, offers,

21   returns, repairs, specifications, and statements of work, sufficient to show, for each

    year since the first purchases by Thales of Astronics' 110V in-seat power systems

22   for installation in Airbus, Boeing, Bombardier, or Embraer aircraft in the United

    Kingdom, France, Spain, Germany or Japan, or in the aircraft of any other aircraft

23   manufacturer in those countries, the number of units sold that were or would be

    installed in each of those countries, including any returns, repairs or free samples.

24   ### 1.    <u>Lufthansa's Position</u>

25       73.    Lufthansa specifically seeks the information requested relating to the

26   parts sold for installation in specific aircraft and in each of the relevant countries as

27   it relates to some of the key issues in the Foreign Proceedings:  AES's liability for

28   indirect infringement and indirect deliveries to the countries in the Foreign

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1

Proceedings, damages due from AES and other downstream entities, liability of other potential infringers, Thales' liability for infringement, and potential damages from Thales.  In particular, Lufthansa asks this Court to order Thales to produce representative sample sets of purchase orders and sample sets of delivery schedules with Airbus as set forth below.

74.     **Purchase orders:**  Rather than requesting all documents that might relate to Thales' sales by aircraft type or sales to a relevant country and to limit the burden on Thales, Lufthansa suggests that Thales produce 12 representative sample sets (four sets each for Germany, the UK, and France) of purchase orders[14] (including all documents associated with the purchase order; *i.e.*, invoice, packing slip, certificates, other shipment information, technical specifications) for each year since 2007 for Germany, 2011 for the UK, and 2012 for France.  But Thales refuses even this sample set, as it has provided no purchase orders with its customers.

75.     As noted in Section III.B., *supra*, the invoices obtained in Germany indicate at least 12 AES parts that were shipped to Germany, yet inexplicably are missing from Thales' reported sales to Germany.  Thus, it is critical that Lufthansa obtain these sample documents, both because they are relevant to the determination of infringing sales (including by showing periphery parts sold with the directly infringing parts) and because they allow Lufthansa to cross check the purchase and sales spreadsheets, verify the prices indicated therein, identify other potential infringers, and establish evidence relating to Thales' and AES's knowledge and liability for shipments to addresses in the relevant countries.

76.     **Delivery schedules:**  The requests above also seek delivery schedules showing the units sold for installation in each aircraft type and in each of the

---

[14] Purchase orders are also relevant to the request for contracts Request 6 (*see* Section III.D., *infra*), and alternatively are responsive to that request.  Further, these Requests 4 and 5 also relate to specifications and statements of work, but those documents are also covered by Requests 7 and 8, and are discussed there.  *See* Sections III.E. and III.F., *infra.*

relevant countries.  As do Requests 6 (seeking contracts with third parties, which reference delivery schedules (*see* Section III.D., *infra*)) and 10-11 (seeking information regarding AES's knowledge of the intended aircraft type or country of installation of 110V in-seat power parts, which can be discerned from delivery schedules (*see* Section III.H., *infra*).  Delivery schedules are expected to show the number of units sold, the required delivery time, the intended aircraft (and sometimes tail numbers), as well as the location of installation.  Lufthansa has previously requested that Thales at least provide 20 examples of aircraft manufacturer, in particular Airbus, delivery schedules provided to Thales by Airbus directly or indirectly through its customers or third parties.  Thales has not provided any justification as to why just 20 sample delivery schedules is too burdensome to produce in light of their importance.

**77.    Lufthansa asks that Thales be ordered to produce 12 representative sample sets of purchase orders for each year as set forth above in ¶ 74, and 20 sample sets of delivery schedules with Airbus as set forth above in ¶ 76.  Lufthansa will then promptly review and evaluate those to determine whether to confer with Thales as to whether production of any additional purchase order sets and delivery schedules is warranted.**

### 2.    Thales' Position

78.    As Thales Avionics asserted in its timely objections to the Subpoena Morris Decl., ¶5, Ex. 1)), Request Nos. 4 and 5 are vague, unduly burdensome, and intrusive. These requests purports to require Thales Avionics to identify documents sufficient to show the number of undefined "units" sold in each of five countries in a period reaching as far back as nearly sixteen years and further to do so by "each aircraft  type."

79.    Again, the parties expressly determined to undertake the production of the spreadsheets in lieu of Requests 4 and 5. Those spreadsheets total thousands of lines of data compiled and delivered to Lufthansa in a good-faith effort to provide

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

1  Lufthansa the universe of information they sought. Thales Avionics has now twice

2  permitted Lufthansa the opportunity to test the spreadsheet data, which has only

3  reconfirmed the reliability of the data.

4      80.    Permitting Lufthansa to move forward by now requiring further

5  production of specific documents in addition to the spreadsheets is an unfair and

6  undue burden on Thales Avionics. Lufthansa's current ask is particularly

7  outrageous as it again refuses to a final, binding compromise but insists that after

8  this additional discovery is made, Lufthansa will decide whether or not it is

9  satisfied or will demand additional discovery.

10     **D.    REQUEST 6**

11     All contracts between Thales and third parties involving the purchase,
   offering, return or repair of 110V in-seat power systems for installation on Airbus,

12  Boeing, Bombardier, or Embraer aircraft in the United Kingdom, France, Spain,
   Germany or Japan, or in the aircraft of any other aircraft manufacturer in those

13  countries.

14

15     **1.    Lufthansa's Position**

16     81.    Lufthansa seeks Thales's contracts relating to 110V in-seat power

17  systems, which are relevant to most of the key infringement issues discussed above:

18  damages for infringement and liability for infringement.  For instance, the contracts

19  are believed to specify intended aircraft types for components, which relates to the

20  location of installation.  Furthermore, the contracts may also have information

21  regarding whether installations are intended for line-fit (new planes), or retro-fit

22  (installation of new parts in older planes), which is similarly relevant to

23  determining the place of installation of the accused parts.  Lufthansa therefore asks

24  that Thales produce all such contracts with its largest customers (and their

25  affiliates) in the relevant countries:  Air Lease; Airbus; BMI, British Midland;

26  Boeing; British Airways; GE Comm. Aviation; Japan Airlines; Korean Airlines;

27  Libyan Airlines; Oman Air; Qatar Airways; Saudi Arabian Airline; Srilankan

28  Airlines; and Turkish Airlines.

82.     Instead of providing these relevant documents, Thales has only provided its contracts with AES (and has not even provided key associated documentation with those contracts as discussed in Section III.D., *infra*).  Thales has failed to produce key agreements with Boeing and Airbus, which are believed to exist according to Thales' Rule 30(b)(6) deponent's testimony:

> 12   Q   So as you sit here, are you even aware of whether
> 13         Thales has contracts with Boeing and Airbus, for
> 14         example?
> 15   A   I'm assuming, but I don't know.  I'm not
> 16         involved.· It's not part of my job.

Smith Decl., Ex. N, 54:12-16.

83.     Thales offered to consider producing the Boeing and Airbus contracts, but only if Lufthansa agreed to drop its request for any other relevant contracts. Rosenberg Decl., ¶ 14.  But, the relevant contracts sought relate to 110V in-seat power systems that have already been found to infringe.  They are critically relevant to determining whether and how parts were offered, shipped, and sold (*e.g.,* as individual components or as a system, which impacts the infringement analysis); the volume of infringing units; the identity of potential infringers; the knowledge of contracting parties as to the features of the 110V in-seat power systems and the demand for certain timing features (which relates to damages as well) of the 110V in-seat power systems; and the destination of the infringing and potentially infringing 110V in-seat power systems.

84.     **Lufthansa therefore asks that Thales provide its agreements with: Air Lease; Airbus; BMI, British Midland; Boeing; British Airways; GE Comm. Aviation; Japan Airlines; Korean Airlines; Libyan Airlines; Oman Air; Qatar Airways; Saudi Arabian Airline; Srilankan Airlines; and Turkish Airlines (and the affiliates of the foregoing).  Lufthansa will then promptly review and evaluate those to determine whether to confer with Thales as to whether production of any agreements is warranted.**

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1

## 2.   **Thales' Position**

85.   As Thales Avionics asserted in its timely objections (Morris Decl., ¶5, Ex. 1), Request No. 6 is unduly burdensome and intrusive.  The request purports to require Thales Avionics to produce "[a]ll contracts" related to 11OV in-seat power systems for installation in five countries in a period reaching back as far as sixteen years. Moreover, the documents sought are highly sensitive and confidential documents that do not appear relevant to any foreign proceeding, and production of which is disproportionate to the needs of any such proceeding. As written, the request would require Thales Avionics to review every contract with every vendor and customer, and then manually cross-check that against the responsive program numbers, part numbers, invoices, or other identifying information.

86.   Thales Avionics has multiple suppliers, so Lufthansa's allegation that any IFE units supplied to Airbus or Boeing are relevant fails to understand that such transactions could have no relation whatsoever to AES or the infringement allegations Lufthansa has brought. *See* Morris Decl., ¶ 19, Ex. 8, ¶¶ 4-5. Thales Avionics produced responsive contracts with AES and sought to explore with Lufthansa whether a compromise regarding other documents was possible. Whether or not Thales Avionics has contracts with other parties, including for example Airbus or Boeing, is not relevant to whether allegedly infringing AES parts were shipped into a particular country. Lufthansa knows this because Thales Avionics has already identified its alternative supplier for parts similar to the AES parts at issue.

87.   Here, again, even Lufthansa's belated "reduced" request is extremely broad and vaguely crafted. (The request also would reach to "affiliates of the foregoing," which begs the opportunity for further confusion.) And, here again, Lufthansa refuses to enter into a binding compromise. Rather, it reserves the right to insist on further production even if Thales Avionics complies.

## E.   **REQUEST 7**

45164448.1

All statements of work between Thales and third parties involving the purchase, storage, shipment, offering, return or repair of 110V in-seat power systems for installation on Airbus, Boeing, Bombardier, or Embraer aircraft in the United Kingdom, France, Spain, Germany or Japan, or in the aircraft of any other aircraft manufacturer in those countries.

### 1.  **Lufthansa's Position**

88.    This request seeks statements of work, which relate to the purchases and sales of accused equipment, as well as AES's knowledge of the aircraft type and delivery location of accused parts, all of which is at issue in the Foreign Proceedings. *See also* Requests 10 and 11 at Section III.H., *infra*. Statements of work define the respective technical requirements of the parts that Thales sells to its customers and/or that Thales purchases from AES. Each statement of work describes a different part of the system or the system, and includes technical information regarding the features of the parts, which is relevant to both infringement liability and damages as it relates to the demand for certain infringing features (such as certain timing features covered by Lufthansa's asserted patent in Germany). Thus, Lufthansa asks this Court to require Thales to provide at least the most relevant of these statements of work as specified below.

89.    Instead of producing a reasonable sample set of statements of work, Thales produced only a single statement of work from 2006, which does not explicitly identify the supplier, but may be a statement of work with AES given that Thales and AES soon after agreed to an exclusive supply agreement for the B787 program. Smith Decl., Ex. O, 120:6-125:23. And that statement of work underscores the importance of those documents. Notwithstanding both AES' and Thales' claims that AES does not know the aircraft type or location of installation of the accused products sold by Thales, just the single statement of work provided proves otherwise. Specifically, the subject of the statement of work reads:

45164448.1

1 [REDACTED] ." Smith Decl., Ex. L, p. 1

2 (emphasis added). [REDACTED]

3 [REDACTED] . *See also id.* at 13-15 (referencing the "[REDACTED]

4 [REDACTED] "). Moreover, the statement of work expressly states that [REDACTED]

5 [REDACTED] ." *Id.* at 17. If this

6 statement of work is with AES as suspected, it would be further evidence of AES's

7 knowledge of the end customer of the parts. This undermines all of the

8 representations made by AES to the contrary, and shows the importance of

9 Lufthansa's receipt of this contradictory and highly relevant evidence.

10     90.    In order to limit the burden on Thales, Lufthansa requests that Thales

11 provide the statements of work with third parties, including AES, and its largest

12 customers (and their affiliates) in the relevant countries: Air Lease; Airbus; BMI,

13 British Midland; Boeing; British Airways; GE Comm. Aviation; Japan Airlines;

14 Korean Airlines; Libyan Airlines; Oman Air; Qatar Airways; Saudi Arabian

15 Airline; Srilankan Airlines; and Turkish Airlines, which cover any outlet unit

16 (ACOU, Power Outlet, RPO, OU), in-seat power supply (or ISPS, including Seat

17 Power Modules (SPM) and Seat Power Boxes (SPB)), or Master Control Unit

18 (MCU/AMCU/EMCU) for 110V in-seat power systems.

19     91.    **Thus, given the importance and relevance of this request,**

20 **Lufthansa asks this Court to require Thales to provide at minimum, a**

21 **statements of work from 2007 to 2018 for each of AES and the top customers**

22 **identified above with respect to the parts identified above. Lufthansa will then**

23 **promptly review and evaluate those to determine whether to confer with**

24 **Thales as to whether production of any additional statements of work is**

25 **warranted.**

26     **2.**    **Thales' Position**

27     92.    As Thales Avionics asserted in its timely objections Morris Decl., ¶5,

28 Ex. 1), Request No. 7 is unduly burdensome and intrusive. The request purports to

require Thales Avionics to produce "[a]ll statements of work" related to 11OV in-seat power systems for installation in five countries in a period reaching back as far as sixteen years. Moreover, the documents sought are highly sensitive and confidential documents that do not appear relevant to any foreign proceeding, and production of which is disproportionate to the needs of any such proceeding. As written, the request would require Thales Avionics to review every contract with every vendor and customer, and then manually cross-check that against the responsive program numbers, part numbers, invoices, or other identifying information.

93.     Thales Avionics' statements of work contain particularly sensitive competitive and technical information, have little relevance to Lufthansa's discovery needs, and are redundant of other materials already produced. Thales Avionics has already provided detailed information of its shipments of AES parts or of assemblies that include AES parts to the relevant jurisdictions.

94.     And, here again, Lufthansa refuses to meaningfully narrow its request, and again seeks to reserve the right to insist on further production even if Thales Avionics complies with Lufthansa's request.

## F.     REQUEST 8

All specifications that Airbus, Boeing, Bombardier, or Embraer or other aircraft manufacturers provided to Thales for 110V in-seat power systems to be installed on Boeing, Bombardier, or Embraer aircraft in the United Kingdom, France, Spain, Germany or Japan, such as, but not limited to, technical specifications, equipment specifications, technical memorandums, bulletins, approvals of modifications etc., or in the aircraft of any other original equipment manufacturer in those countries.

### 1.     Lufthansa's Position

95.     This request relates to specifications and technical documents pertaining to the features and workings of the accused system, which is directly relevant to the infringement analysis.  In addition, this request seeks aircraft manuals, which show the parts installed on a given aircraft, and relate to Thales'

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1

knowledge of the assembly of certain accused parts in an infringing manner in the relevant countries.  The request also relates to approval documentation, which shows the aircraft types for which parts have been approved, and thus the location of installation of accused parts.  Lufthansa asks this Court to require Thales to produce at least a representative sample of these specifications and related manuals, as well as the related approval documents.

96. **In particular, Lufthansa suggests that Thales provide at least 20 sample specifications provided by Airbus and Boeing relating to outlet units and in-seat power supplies (10 samples for each); 20 sample aircraft manuals (relating to at least five different aircraft types (A380, A350, A320, A321, A319)); and the respective reapproval documentation for those parts and aircraft.  Lufthansa will then promptly review and evaluate those to determine whether to confer with Thales as to whether production of any additional specifications, manuals, and approval documentation is warranted.**

## 2.   Thales' Position

97.   As Thales Avionics asserted in its timely objections (Morris Decl., ¶5, Ex. 1)), Request No. 8 is unduly burdensome and intrusive. The request purports to require Thales Avionics to produce "[a]ll specifications" related to 11OV in-seat power systems for installation in five countries in a period reaching back as far as sixteen years.

98.   Lufthansa already has records of Thales Avionics' shipments. Morris Decl., ¶ 13. Moreover, Thales Avionics' "knowledge of the assembly of certain accused parts" is currently irrelevant in each of the jurisdictions. Thales Avionics is a party in France, but that proceeding has been bifurcated to first determine whether the AES parts even infringe Lufthansa's patent. Lufthansa's renewed threats of actions in Spain and Japan, which Lufthansa has now purportedly been "reasonably" contemplating for more than nine years (*see* Morris Decl., ¶ 22, Ex. _11 at ¶ 5), and its new threats, to pursue Thales Avionics in Germany and the

45164448.1

United Kingdom, are increasingly unrealistic and also confronted by the reality of the various statutes of limitations, of repose, and of similar mechanisms. Morris Decl., ¶ 5, Ex. 1, ¶ 11.

99.    And, here again, Lufthansa refuses to meaningfully narrow its request, and again seeks to reserve the right to insist on further production even if Thales Avionics complies with Lufthansa's request.

## G.    REQUEST 9 (AND 12, TO THE EXTENT NOT DUPLICATIVE)

Request 9 - Documents sufficient to show all part numbers of 110V in-seat power systems purchased, stored, shipped, offered, returned or repaired by Thales from Astronics for installation in Airbus, Boeing, Bombardier, or Embraer aircraft in the United Kingdom, France, Spain, Germany or Japan, or in the aircraft of any other aircraft manufacturer in those countries, from the time of the first such purchases to the present.

Request 12 - Documents sufficient to show all part numbers of 110V in-seat power systems purchased, offered, shipped, stored, repaired, returned by Thales from Astronics for installation in Airbus, Boeing, Bombardier, or Embraer aircraft in the United Kingdom, France, Spain, Germany or Japan, or in the aircraft of any other aircraft manufacturer in those countries, from the time of the first such purchases, shipments, storage, offers, repairs, returns to the present.

### 1.    Lufthansa's Position

100.    Lufthansa's requests seek all part numbers purchased (etc.) from AES, which is relevant to the identification of infringing products, infringing purchases from AES, and infringing sales by Thales.  To date, the only information that Thales has provided relevant to this request is a few contracts with AES and some forecasting documents.  However, it is believed that these lists are updated at least annually, thus Thales production remains deficient.  **Lufthansa asks this Court to require Thales to comply with these requests in full, requiring Thales to provide a full and complete listing of all Thales part numbers of 110V in-seat power systems.**

### 2.    Thales' Position

101.    Lufthansa has already waived Request 12 after Thales Avionics objected to it as duplicative of Request No. 9, and pointed out that it appeared to be

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1

a copy and paste error in Lufthansa's document.  Morris Decl., ¶ 10. Due to the turnover in the Lufthansa litigation team, Thales Avionics has now **four times** had to remind Lufthansa that Lufthansa had already waived Request 12. Morris Decl., ¶ 10.  This is further indicative of the utter lack of concern Lufthansa has had in fulfilling its obligation to minimize the burden of its discovery to the extent reasonably possible.

102.   As Thales Avionics asserted in its timely objections to the Subpoena (Morris Decl., ¶5, Ex. 1)), Request Nos. 9 and 12 are also vague, unduly burdensome, and intrusive. As written, it is unclear whether the request seeks the part numbers as assigned by Thales Avionics, by Astronics, or by Airbus, Boeing, Bombardier, Embraer and any other aircraft manufacturer in any of the United Kingdom, France, Spain, Germany, or Japan. The request requires the identification of part numbers associated with 11OV in-seat power systems, which itself has been defined to include parts that could potentially be used in conjunction with 11OV in-seat power systems, and to do so over a period that reaches back nearly sixteen years.

103.   Regardless, and without waiving its objections to Request Nos. 9 and 12, Thales Avionics has already complied in full by producing a report from its database that identified any AES part number in the database with its corresponding Thales Avionics cross-reference. The document was a spreadsheet titled "AEO Confidential Thales AES Material Number Cross References" and was produced on August 30, 2019.

## H.   REQUESTS 10 AND 11

Request 10 - Documents sufficient to show, for each year since the first purchases, shipments, storage, offers, repairs, returns in the United States by Thales of Astronics 110V in-seat power systems for installation on Airbus, Boeing, Bombardier, or Embraer aircraft in the United Kingdom, France, Spain, Germany or Japan, or in the aircraft of any other aircraft manufacturer in those countries, that Astronics knew or should have known that the units it sold, offered, shipped, stored, repaired, returned were going to be installed on a specific aircraft type, and the number of units sold that Astronics knew or should have known would be

45164448.1

installed on each aircraft type.

Request 11 - Documents sufficient to show, for each year since the first purchases, shipments, storage, offers, repairs, returns in the United States by Thales of Astronics 110V in-seat power systems for installation on Airbus, Boeing, Bombardier, or Embraer aircraft in the United Kingdom, France, Spain, Germany or Japan, or in the aircraft of any other aircraft manufacturer in those countries, that Astronics knew or should have known that the units it sold were going to be installed in those countries, and the number of units sold that Astronics knew or should have known would be installed in each of those countries.

### 1.    Lufthansa's Position

104.    These requests relate to AES's knowledge of parts intended for certain aircraft types or for installation in certain countries.  The information is relevant to the liability and extent of liability of AES and other entities for parts that are sent by Thales (or its customers) into one of the relevant countries—a critical issue emphasized by Lufthansa on a number of occasions in these proceedings and throughout this stipulation.  Lufthansa therefore asks this Court to require Thales to conduct a reasonable search for communications or other documents evidencing AES's knowledge that its parts would be installed on specific relevant aircraft types or in the relevant countries as set forth below.[15]

105.    In particular, the parties previously agreed that Lufthansa would provide search terms that Thales would run on appropriate custodians' emails and documents to identify responsive documents.  But now Thales has gone back on the agreement.  Lufthansa provided those search terms to Thales on February 12, 2020. Rosenberg Decl., ¶ 15.  During the parties' meet and confer on March 12, 2020, Thales indicated it was not capable of running the suggested terms, but it has thus far refused to provide any further explanation or alternative suggestion for searching its files.  *Id.*; *see also* Smith Decl., Ex. E, 11 (asking Thales in April 2020

---

[15] Requests 10 and 11 call for more than just emails showing AES's knowledge.  Indeed, these requests call for any documents that evidence AES's knowledge, which also includes statements of work (also covered by Request 7 (*see* Section III.E., *supra*)), purchase orders (also covered by Requests 4 and 5 (*see* Section III.C., *supra*)), contracts (also covered by Request 6 (*see* Section III.D., *supra*)), and specifications (also covered by Request 8 (*see* Section III.F., *supra*)).

1  to "Please explain exactly what the issue is with running the suggested terms and

2  please immediately inform us of the boundaries for searches that can be run in

3  Thales' systems.").

4      106.   Finally, Thales has not yet produced more than one purchase order to

5  AES or *any* proposals or other documentation (*e.g.*, meeting protocols) relating to

6  110V in-seat power systems for an aircraft type assembled in one of the relevant

7  countries or meetings held, for instance, at Airbus' premises in Toulouse (in the

8  relevant country of France) or Hamburg (in the relevant country of Germany) that

9  may indicate the location of intended installation of 110V in-seat power systems.

10 Such documents are directly responsive to the request for information showing the

11 units sold for use in specific aircraft or installation in one of the relevant countries.

12 For instance, the purchase orders between Thales and AES may indicate Thales's

13 buyer, thereby establish knowledge of AES regarding the final installation

14 destination of the parts it sells to Thales.  The single purchase order that Thales

15 provided indicates a field for the "buyer," but in that case, it is blank.  This

16 information is critical to the issue of indirect liability, and at minimum, Thales

17 should provide a sample set of at least five purchase orders to AES per year from

18 2007 to 2018.

19     **107.   Given the reasonableness and relevance of the request, Lufthansa**

20 **asks this Court to require Thales to search the relevant email custodians for**

21 **the terms provided in the February 12, 2020 letter.  To the extent that Thales**

22 **identifies any problematic terms, the parties can meet and confer to narrow**

23 **those terms.  However, Lufthansa asks this Court to make clear that Thales**

24 **must reasonably search its files for production in response to these requests.**

25 **Further, Lufthansa asks this Court to compel Thales to produce at least 5**

26 **sample sets of purchase orders with AES (including all associated**

27 **documentation) per year from 2007 to present as well as all meeting protocols**

28 **relating to 110V in-seat power systems for Airbus.**

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1

## 2.    **Thales' Position**

108.    As Thales Avionics asserted in its timely objections to the Subpoena (Morris Decl., ¶5, Ex. 1)), Request Nos. 10 and 11 are vague, unduly burdensome, and intrusive. Thales Avionics cannot know what Astronics "knew or should have known." It is unclear to what the undefined term "units" referred, and even were that term defined, it would be unduly burdensome and intrusive for Thales Avionics to be required to attempt to identify documents that quantify for each of the last sixteen years the units "sold, offered, shipped, stored, repaired, returned" or that were "going to be installed," and also do so by "each aircraft type" or by Lufthansa's requested geographic division.

109.    Lufthansa already has extensive testimony that Thales Avionics does not discuss with AES to where or to whom parts it may purchase from AES go. Morris Decl., ¶ 13, Ex. 4, ¶¶ 9-10; *id.*, ¶ 17, Ex. 6, 52:25-53:4.

110.    The parties discussed August of last year conducting a reasonable search of the email accounts of the handful of Thales Avionics employees who would have corresponded with AES. Lufthansa promised to promptly produce its suggested protocol, a promise it repeated several times over the next several months when Thales Avionics inquired, asking so as facilitate workflow.  Morris Decl., ¶¶ 8, 24, Ex. 13.

111.    Finally, in February, when Lufthansa produced its protocol, which is attached and is demonstrably unworkable. Morris Decl., ¶ 25, Ex. 14. The proposed protocol involves thousands of iterations in a search that would overwhelm of any processor. Even looking at the searches themselves demonstrates the challenge of the search logic, let alone the scope.  Even setting aside the fill-in-the-blanks element of the protocol, the result of the permutations of the proposed protocol is something akin to 5,458 searches.

112.    It is clear from Lufthansa's lengthy delay that this information is not of significant interest to Lufthansa. It is likewise clear from its proposed search

protocol that Lufthansa is uninterested in fulfilling its obligation to cooperate to minimize the burden on Thales Avionics. Particularly in light of the testimony already adduced on this matter, Thales Avionics should be asked to produce nothing further.

## I.   INFORMATION RELATING TO SPAIN AND JAPAN

### 1.   Lufthansa's Position

113.   Each of the requests in the Subpoena seeks information pertaining to five relevant countries:  the United Kingdom, France, Germany, Spain, and Japan. The purpose of the requests with respect to Spain and Japan is for Lufthansa to assess infringement in those jurisdictions as well as the extent of infringement in those jurisdictions.  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 243 (2004) (holding that "[t]he 'proceeding' for which discovery is sought under § 1782(a) must be within reasonable contemplation, but need not be 'pending' or 'imminent.'"); *see also Mees v. Buiter*, 793 F.3d 291, 301 (2d Cir. 2015) (holding that an applicant meets Section 1782's "'for use' requirement by showing that the materials she seeks are to be used at some stage of a foreign proceeding that was within reasonable contemplation").

114.   However, Thales has only produced limited information regarding some offers to Spain but no information on shipments to Spain or Japan after August 2015.  Smith Decl., ¶ 19.  **Rather than seeking to enforce the full Subpoena at this time with respect to those two countries, Lufthansa asks this Court, just as it has asked Thales, to first order Thales to produce sales of 110V in-seat power systems to those countries pursuant to Requests 2 and 3 of the Subpoena.).  Lufthansa would then review the information to determine whether to seek any further production of information with respect to those countries.**

### 2.   Thales Avionics' Position:

115.   Lufthansa's discovery requests relating to Spain and Japan, which

45164448.1

were worrisome at the beginning of this proceeding, have only become more problematic as the matter progressed.  Thales Avionics is in an impossible situation. When Thales Avionics produces information to Lufthansa, Lufthansa refuses to believe it. Each time Thales Avionics undertakes another database report, it is a further burden. And each time, Thales Avionics' efforts are met with a demand from Lufthansa for something different or more.

116.   The information Lufthansa seeks is confidential, it is burdensome to produce it, and it has only become clearer that Lufthansa's claim that proceedings in Spain and Japan are reasonably contemplated is entirely empty—Lufthansa has been repeating that line to courts in 1782 actions *for more than nine years*, the patents at issue have expired, Lufthansa has been pursuing its infringement claims for ten years, and has already chosen the jurisdictions it intends to litigate, Spain and Japan are not among them.

## J.   FRCP 30(B)(6) DEPOSITION

1. Thales Avionics's document retention policies and storage system(s) for each category of documents that is identified in Lufthansa's Subpoena.

2. The steps taken by Thales Avionics to search its electronic and paper files for documents responsive to Lufthansa's Subpoena.

3. The steps taken by Thales Avionics to create the spreadsheets Thales Avionics has produced.

4. Joint efforts between AES and Thales Avionics to advertise, sell, deliver, or service 110V In-Seat Power Systems in Germany, the United Kingdom, or France.

5. Thales Avionics's sales practices and procedures for selling 110V In-Seat Power Systems or Thales Avionics's assemblies incorporating 110V In-Seat Power Systems delivered to or installed in the United Kingdom, France, or Germany.

6. Thales Avionics quality and control regarding AES products.

7. Thales Avionics's procedures for tracking geographic sales or distribution location, modification levels, final destinations, and aircraft type end use by part numbers for AES parts.

8. All contracts and agreements between Thales Avionics and AES

concerning the 110V In-Seat Power Systems, as well as the negotiations that led to such agreements.

### 1. Lufthansa's Position

117. Lufthansa served an FRCP 30(b)(6) deposition notice on Thales on September 19, 2019, and the parties subsequently negotiated modified topic, which were finalized on November 7, 2019. Rosenberg Decl., ¶¶ 3-6. However, Thales has not designated a witness on certain of those topics and has not provided a witness sufficiently prepared or knowledgeable with respect to others of those topics. **Lufthansa asks that this Court require Thales to designate and produce a witness knowledgeable on topics 1-8 as explained below.**

118. In particular, Thales has not yet designated a witness on the agreed-upon topic 1, topic 4 (with respect to the delivery or service of 110V In-Seat Power Systems in Germany, the United Kingdom, or France), topic 6, or topic 7 (with respect to the procedures for tracking geographic sales or distribution location, modification levels, final destinations, and aircraft type end use by part numbers for AES parts; as the witness presented on this topic was only prepared to discuss generally who the customers were and where the parts might end up). Smith Decl., Ex. K. These topics are all relevant to Thales' production of information (topic 1), Thales' and AES's liability for infringement (topics 4, 6, 7), and Thales' and AES's damages (topics 4, 6, 7); and Thales should be ordered to designate a witness on these agreed upon topics.

119. Furthermore, the witnesses Thales presented on topics 2, 3, 4 (to the extent designated), 5 and 8 where wholly unprepared on their respective designated topics, and Thales should be ordered to designate and prepare witnesses on those topics. *Id.* at Ex. K; *see also id.* at Ex. C, 1-3. For instance, Mr. Acebedo was designated for topic 2, but did not participate in the search for electronic or paper files and could not provide testimony on this topic. Rosenberg Decl., ¶ 8; Smith Decl., Ex. M, 12:19-13:3, 51:22-52:6:

19 Q No. Okay. Topic 2 is:

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

20"The steps taken by Thales Avionics to
21search its electronic and paper files
22for documents responsive to Lufthansa's
23Subpoena."
24Do you see that?
25    AI see that.
1     QIs it your understanding that you're here to
2         testify about that topic?
3    A  Yes.
22QMr. Acebedo, other than working on the
23spreadsheets, was there anything else you did as part of
24Thales's document production?In other words, did you
25talk to any document custodians about documents they had
1that was different from the data in the database?Did
2you ask them, like, for contracts or anything like that?
3    A  No.
4QDid you do any kind of review of paper files
5whatsoever?
6    A  No.

120.    Mr. Acebedo provided some testimony regarding the spreadsheet

production (topic 3), but again was unable to testify about many of the Thales

spreadsheets because he had never even seen some of them prior to his deposition.

Rosenberg Decl., ¶ 8; *see also* Smith Decl., Ex. M, 131:7-133:1:

7MR. ROSENBERG:Okay.All right.Let's go to
8     the next spreadsheet.So we're going to Spreadsheet 11,
9     which should be Exhibit 15.And that is "AEO
10        Confidential, SAP, Astronics Parts."
11(Exhibit 15 was marked for identification by
12     the court reporter and is attached hereto.)
13MR. ROSENBERG:And why don't you scroll over.
14     Is that the top?Yeah.
15QMr. Acebedo, is this a spreadsheet you prepared?
16    A  No.
17QDo you know who prepared this spreadsheet?
18    A  No.
19QDo you know what this spreadsheet is?
20AData.
21QYeah.But it doesn't have any sales.Does it
22     have sales numbers?I don't think so.Okay.

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1

23 Is this the first time, to the best of your
24      recollection, that you're seeing this spreadsheet?
25   A   Yes.
1    Q   Okay. All right.
2        MR. BICKS:  This is Exhibit 15?
3        MR. ROSENBERG:  This is Exhibit 15, yes.
4        All right.  Let's move on.
5        So we're now going to spreadsheet 12, which will
6        be Exhibit 16, which is "AEO Confidential, SAP,
7        Astronics Payments."
8        (Exhibit 16 was marked for identification by
9        the court reporter and is attached hereto.)
10       MR. ROSENBERG:  This has several tabs.  Why don't
11       we start with the leftmost tab.  So this is a tab that
12       says "Summary by Year."
13       And maybe you can show Mr. Acebedo the other
14       tabs, so he's familiar with this.
15       The next one says "Summary by Parts"; and then
16       the next one is called "Sheet 1," which has numbers and
17       a graph; and then the next tab says "Z" -- is that a "W"
18       or an "M"?
19       THE WITNESS:· "M." --
20       MR. ROSENBERG: -- "-MMP" --
21       THE WITNESS: -- "PO" --
22       MR. ROSENBERG: -- "OR."· All right.
23   Q   Is this a spreadsheet you prepared?
24   A   No.
25   Q   Is this a spreadsheet you are familiar with?
1    A   No.

121.  As another example, Mr. Marzzacco was designated on topics 4
(partially on the advertise and sell portions of the topic) and 5 (relating to joint
efforts with AES and relating to Thales' sales practices and procedures), but was
unable to explain Thales advertisement conducted by its office in Toulouse, France,
because he did not inquire about this with his counterpart for the European market,
Bruno Guinamand—Director of Sales for Europe.  Rosenberg Decl., ¶ 10; *see also*
Smith Decl., Ex. O, 138:12-139:9:

12   Q   So I want to follow up on a few of these.· So
13       topic four, the joint efforts topic, I want to make sure

LR 37 JT: STIP. RE. LHT MO1. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1

14    I've got the full scope of your knowledge on this.· So
15    first, it talks about joint efforts between AES and
16    Thales avionics to advertise.· First, it talks about
17    advertise in-seat power systems in Germany, the United
18    Kingdom, or France.
19    What, if anything, do you know about joint
20    efforts between AES and Thales to advertise 110-volt
21    in-seat power systems in any of those three countries?
22    MR. KENT:· Asked and answered.
23    THE WITNESS:· Yeah.· I don't have much
24    understanding of any joint advertising.· We typically
25    don't do a lot of advertising in general, so I wouldn't
1    imagine any of this either.
2    BY MR. ROSENBERG:
3  Q  Okay.  Did you talk about any joint advertising
4    efforts with Bruno when you talked to him?
5  A  We talked about how products are sold.· We
6    didn't specifically mention advertising.
7  Q  What about when you talked to Christine, did
8    you talk about advertising?
9  A  No.  Not specifically.

122.   With respect to topic 8 relating to contracts and agreements between Thales and AES, Thales' designee Mrs. Ware had not even investigated the contents of the attached statements of work referenced in the Thales-AES contract and could not provide any testimony about those statements of work.  Rosenberg Decl., ¶ 9; *see also* Smith Decl., Ex. N, 64:15-65:21:

15  Q  So if we look -- let me find the right page.  So
16    if we look at -- if we look at page THA -09- -- hold on.
17    I'm just trying to find Attachment 2 here.  Give me a
18    second.  Here it is.  Page THA -096.  Do you see
19    "Attachment 2" is listed?  And it lists, at the top,
20    "Current Statements of Work."  Do you see that?
21  A  I do.
22  Q  And it lists three current statements of work.
23    Do you see that?
24  A  I do.
25  Q  Did you review those statements of work in
1    preparation for today's deposition?
2 A  No, I did not.

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1

3 Q Have you ever reviewed any statements of work
4      between AES and Thales?
5 A Not that I can recall.
6 Q Okay. Sitting here today, do you have any idea
7      what these statements of work say?
8 A No, I don't.
9 Q Okay. Are you at all familiar with statements of
10     work between Thales and AES, even in the general ...
11 A I know they exist. Is that general enough?
12 Q Yeah. But other than that, you don't have any
13     more knowledge?
14 A My team would have been working through the
15     statements of work if it was a working knowledge.
16     Q Okay. But you didn't -- you didn't ask anybody
17     about that knowledge to prepare for today's deposition?
18     A No, I didn't. I believe there was [sic] some
19     statements of work provided, but I haven't read through
20     all of the statements of work in preparation for the
21     day.

123.   Those statements of work are critical components of the agreements

between Thales and AES, which are highly relevant to Lufthansa's infringement

actions in Germany, the UK, and France, as well as the contemplated actions in

Spain and Japan.  For instance, those patent infringement actions rely mainly on the

technical features of 110V power parts and AES's knowledge of the purchase and

assembly of its parts in the Thales IFE systems, and the statements of work are

directly relevant to those issues.

124.   Ms. Ware, the designee on the topic of contracts with AES, was also

unable to provide testimony about the amendments to the Thales-AES contract.

Rosenberg Decl., ¶ 9; *see also* Smith Decl., Ex. N, 88:15-93:17.  As an example,

Ms. Ware's testimony as to a few of the amendments is excerpted below (*id.* at

88:15-90:5):

15   Let's just spend a minute going through a few of
16   these amendments.· I may not have very many questions
17   about them but -- so Exhibit 5A we marked --
18   A   Are we finished with 14?

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1

19  Q   For now, yes, sure.
20  A   Okay. Okay.
21  Q   Exhibit 5A is the first amendment to the 2012
22  agreement.  Do you see that?
23  A   I do see it, yes.
24  Q   And it talks about changing the title of
1and Remedy," and then it says (as read):
2"The text of such in Subsection 14.3.1
3is deleted in its entirety and replaced
4with the word 'Reserved.'"
5Do you see that?
 6  A   I do.
7QDo you have any understanding as to why this was
8done?
9ANo, I don't.
10QAnd you had no role in it?
11ANo, I didn't.
12QOkay.And you didn't investigate it for purposes
13of today's deposition?
14ANo, I didn't.
15QOkay.Exhibit 7 is the second amendment.And
16it's dated July of 2012, if you look at THA -0107.And
17it talks about, on that page, that:
18"Attachment 1, Products, shall be
19deleted in its entirety and replaced
20with Attachment 1-A," and then Attachment 1-A is
21attached to this amendment.
22Do you see that?
23AI do.
24QDo you have any idea why that amendment was made?
25ANo, I don't.
25  Section 14.3 of the agreement to read "Products Warranty
 1  Q   And you didn't play any role in it?
 2  A   Nope.
 3  Q   And you didn't investigate it in preparation for
 4  today's deposition?
 5  A   No, I didn't.

125.   Moreover, Ms. Ware admitted that she had spent "less than two hours"
performing an investigation to prepare for her Rule 30(b)(6) deposition (*id.* at 98:4-
9), despite her deposition taking place more than a month after the parties agreed

48

45164448.1

1   upon topics.  She identified several people at Thales to whom she did not speak but

2   that she thought might have relevant knowledge about topic 8, for which she was

3   designated.  Rosenberg Decl., ¶ 9; *see also* Smith Decl., Ex. N, 94:8-97:13.

4        126.   Finally, given the noted deficiencies in Thales's production of

5   purchase and sales information, Lufthansa has not yet been able to substantively

6   depose a witness with respect to the assembly of information in *corrected* purchase

7   and sales information relating to topics 2 and 3.  Lufthansa believes that it would be

8   most efficient to conduct such a deposition promptly upon Thales's completion of

9   its production.

10       127.   **Lufthansa asks that this Court require Thales to designate and**

11  **produce a witness knowledgeable on topics 1-8 within thirty (30) days after**

12  **completion of the production requested above.**

13              **2.      Thales' Position**

14       128.   Lufthansa's complaints here are clearly disingenuous.

15       129.   For example, complaining about a lack of review of paper files by Mr.

16  Acebedo when Lufthansa well knows that all of the documents and information are

17  in this matter stored electronically.

18       130.   In addition to the declaration Lufthansa had already received regarding

19  the spreadsheets Mr. Acebedo had not himself prepared, Morris Decl. ¶ 13, Ex. 3,

20  Mr. Acebedo produced a supplementary declaration to address any gaps in his

21  deposition testimony, *id.* ¶19, Ex. 8.

22       131.   Lufthansa's complaint regarding Mr. Marzzacco's testimony is that he

23  didn't ask a specific question to the other Thales Avionics staff with whom he

24  spoke, but Mr. Marzzacco answered the question: Thales Avionics does not do a lot

25  of advertising. He is not aware of any joint advertising, and, unsurprisingly, no joint

26  advertising came up when he was discussing marketing efforts with his

27  counterparts in preparation for the deposition. Morris Decl., ¶ 18, Ex. 7, 139:19-

28  140:15.

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1

132.   Likewise, Lufthansa already has testimony regarding the extensive turnover there is a lack of institutional knowledge as to the why and how of specific contractual provisions were negotiated. That, under the pressure of deposition questioning, Ms. Ware identified other persons that she could interview that might potentially have additional information is not an indictment of her preparation—particularly where, as here, when she subsequently spoken with them her initial instinct not to contact them was proven correct as they had no useful information to add. Thales Avionics subsequently produced declarations from each of them to confirm that fact. Morris Decl., ¶ 19, Ex. 9-10.

133.   More telling is that, as with production, Lufthansa is little interested in meaningfully narrowing the outstanding discovery asks, but that its preferred solution is that it be given yet another bite at the apple, notwithstanding the hours of testimony it has already taken from Thales Avionics staff.

## K.   COSTS OF MOTION

### 1.   **Lufthansa's Position**

134.   Lufthansa also asks this Court to shift the costs of this motion to Thales under Federal Rule of Civil Procedure 37(a)(5), due to Thales' unreasonable position and delay.  Lufthansa has now wasted months of time and effort seeking in good faith to negotiate discovery with Thales, only for Thales to refuse production of even a single additional document, without justification.  Rule 37(a)(5)(A) provides in relevant part that:

> If the motion is granted—or if the disclosure or requested discovery is provided after the motion was filed—**the court must**, after giving an opportunity to be heard, **require the party or deponent whose conduct necessitated the motion**, the party or attorney advising that conduct, or both **to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees**. But the court must not order this payment if:

45164448.1

(i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;

(ii) the opposing party's nondisclosure, response, or objection was substantially justified; or

(iii) other circumstances make an award of expenses unjust

(emphasis added).

135.   Such an award for reasonable expenses does not require a finding of willfulness, fault, or bad faith, but merely a finding that a party's actions were not "substantially justified." *See Varney v. Cal. Highway Patrol*, No. C11-4193 TEH (JSC) 2013 WL 2299544, at *2 (N.D. Cal. May 24, 2013); *L. Tarango Trucking v. Cty. of Contra Costa*, 202 F.R.D. 614, 623 (N.D. Cal. 2001).  Thales has the burden of showing that its failure to comply with the Subpoena and Deposition Notice was "substantially justified" or that "other circumstances make an award of expenses unjust." *See Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 784 (9th Cir. 1983); *Raygoza v. City of Fresno*, 297 F.R.D. 603, 608 (E.D. Cal. 2014). Thales cannot meet that burden in light of its:  refusal to produce more than 48 documents; failure to designate witnesses and otherwise provide knowledgeable witnesses on the agreed upon Rule 30(b)(6) topics; and failure to notify Lufthansa that it would no longer fulfil its discovery obligations for over eight months.

136.   Lufthansa sought to obtain this discovery and to negotiate the scope of the discovery in good faith.  It has been more than understanding of business disruptions during the COVID-19 crisis.  Smith Decl., Ex. I, 1 (noting that Thales "appreciates Lufthansa's accommodation of the unprecedented circumstances").].  But Thales's discovery deficiencies arose months before the US business disruptions due to COVID-19.  Lufthansa does agree with Thales that it is "long past time to bring this matter to a close" (*id.*), but not before Thales makes a

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1

1    reasonable effort to comply with the requested discovery under the governing

2    Federal Rules of Civil Procedure.

3        137.   Those rules permit Lufthansa to "obtain discovery regarding any

4    nonprivileged matter that is relevant to any party's claim or defense and

5    proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1); *see also Heraeus*

6    *Kulzer, GmbH*, 633 F.3d at 597 (discussing that once discovery under Section 1782

7    is granted, "section 1782 drops out" and "the ordinary tools of discovery

8    management, including Rule 26, come into play."); *see also Weber v. Finker*, 554

9    F.3d at, 1385 (applying Rule 26(b)(1) to the Section 1782 discovery requests,

10   because "Section 1782 expressly provides that the district court should grant

11   discovery under the Federal Rules of Civil Procedure").

12       138.   Here, Lufthansa has multiple pending infringement suits in the Foreign

13   Proceedings and multiple decisions that its patents are infringed, including by AES,

14   Thales' supplier of hundreds of millions of dollars' worth of parts (*see* Smith Decl.,

15   ¶¶ 17-18).  Thales cannot credibly argue that it is unduly burdensome and

16   disproportionate to ask it to produce more than 48 documents and to produce a

17   knowledgeable witness on the negotiated topics for deposition under Rule 30(b)(6).

18       139.   Moreover, if Thales were not planning to make any further production,

19   it should have notified Lufthansa of that in November 2019, or at the very least it

20   should have notified Lufthansa of that fact after Lufthansa identified the production

21   deficiencies in its letter of December 2019 (sent prior to the disruptions due to

22   COVID-19).  Smith Decl., Ex. C.  Thales again had the opportunity to be forthright

23   regarding its intended refusal of any further production in response to Lufthansa's

24   letter in April 2020.  *Id.* at Ex. E.  But instead of simply telling Lufthansa its

25   position, it did not substantively meet and confer with Lufthansa until July 17,

26   2020.  *Id.* at ¶¶ 10, 15.  For more than three months, Thales strung Lufthansa along,

27   repeatedly promising to substantively respond to the issues noted soon.  *See id.* at

28   Ex. F, 1-2 (May 5, 2020 email from Thales' counsel indicating that they would

"reply soon with more" in response to our email following up on Thales's response to the discovery issues raised in our LR 37-1 letter); *id.* at Ex. G, pp. 2-3 (May 12, 2020 email from Thales' counsel indicating they "hope[d] to confirm some information tomorrow that could help us to promptly resolve most of the remaining items"); *id.* at 1-2 (May 29, 2020 email from Thales' counsel indicating that Thales employees were returning from furloughs on June 1, 2020 and that they would "seek to have a more detailed response to you this coming Friday [June 5]" and that they "could then be available for another meet and confer session on [June 9 or 10]"); and *id.* at 1 (June 8, 2020 email from Thales' counsel indicating that they "anticipate providing the written response tomorrow [June 9] or Wednesday [June 10], which will still permit a meet and confer, if necessary, this week").

140.    In light of Thales' unreasonable position and unreasonable delay in notifying Lufthansa of that position, Lufthansa respectfully requests that this Court require Thales to reimburse Lufthansa for its costs of this motion.

### 2.    Thales' Position

141.    If any costs are here awarded, they should be awarded to Thales Avionics. Lufthansa has failed to minimize the burden of its discovery. Lufthansa has consistently walked away from potential compromises, and, most recently, Lufthansa has refused to enter into any binding compromise with Thales Avionics regarding the scope of its discovery.

142.    On August 14, in response to Thales Avionics' Motion for Reconsideration and to Lufthansa's Motion to Compel, the Court instructed the parties to compromise. The Court was not going to deny the discovery altogether, but-particularly given the parties' report of the compromises they were already negotiating-the Court did not rule on any objections to the individual requests, nor did it endorse those requests.

143.    As a reminder, Lufthansa's requests were largely framed as "documents sufficient" demanded documents spanning more than fifteen years of

45164448.1

purported responsiveness in requests containing two dozen subparts. Among other defects, the requests would require Thales Avionics to determine what another, unrelated company "knew or should have known" and were entirely untethered to the burden imposed on Thales Avionics nor was any significant effort made to minimize that burden. As noted above, so low was the attention to detail that one request was asserted twice with only slightly different wording.

144.   Through the next several months, however, key patterns emerged, as discussed above:

145.   First, Lufthansa always had another ask. For every spreadsheet Thales Avionics produced, Lufthansa requested another modification or another revision.

146.   Second, Lufthansa refused to make any binding compromise. While the pattern had become increasingly evident over the course of the many meet and confer sessions, it was only at the final meet and confer session on July 17, 2020 that Lufthansa stated it was not bound by any compromise and refused to be agree to any binding compromise. The only accommodation it would offer is to agree to review some set of discovery before deciding whether or not it would insist on everything else. Only at this late date did Lufthansa disclaim any obligation to compromise.

147.   Had Lufthansa openly stated its position from the start, Thales Avionics could have been spared the enormous frustration of burden of seeking compromise and of seeking to find a way to make workable Lufthansa's poorly crafted, overly burdensome, and intrusive discovery requests. Had Lufthansa openly stated it believed itself entitled to all the discovery demanded and refused to compromise, the parties could have briefed this matter for decision last summer. Lufthansa did not.

148.   It is true that both parties de-emphasized this proceeding in recent months in the face of the Covid-19 crisis, a patchwork of stay-at-home and similar orders, of resolving basic safety questions for operations, and of a historic collapse

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1

in the aviation industry. For Thales Avionics, this has meant, among other things, significant, company-wide furloughs of substantially all staff, and the exhausting effort to manage the supply chain as both airline customers and key component suppliers cope with their own challenges and re-evaluate priorities. For its part, Lufthansa sought and secured a $10 billion bailout from the German government. *See, e.g.,* Hanna Ziaday, "'We simply don't have any money.' Lufthansa shareholders approve $10 billion bailout," CNN.com, available at https://www.cnn.com/2020/06/24/business/lufthansa-bailout-heinz-hermann-thiele/index.html.

149.   Nonetheless, Thales Avionics came to the July 17, 2020 meet and confer seeking a compromise, sufficiently firm to permit it to build a workplan and also with a clear end point, to bring this action to a close. Thales Avionics even had some hope that the devastating impact on the commercial airline industry could help the parties to focus on getting Lufthansa what it actually needed, if anything.

150.   Instead, after prodding, Lufthansa refused to consider any binding compromise. Lufthansa would not work to any agreement that would ultimately prevent it from insisting on anything but total compliance with its discovery demands as written.

151.   Given the circumstance, Thales Avionics informed Lufthansa that it believed it was time to initiate the formal discovery dispute proceedings under the Local Rule.

## IV.   <u>CONCLUSION</u>

### A.   **LUFTHANSA'S POSITION**

152.   Lufthansa respectfully asks this Court to compel Thales to produce the documents identified above with respect to Subpoena Requests 2-12 within thirty (30) days and to provide a witness(es) to complete topics 1-8 of the noticed deposition of Thales within thirty (30) days thereafter.  Lufthansa also asks this Court to shift the costs of this motion to Thales under Rule 37(a)(5).

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1

## B.     THALES' POSITION

153.    This proceeding should be immediately brought to a close. Lufthansa has never taken seriously its obligation to minimize the burden of discovery on other parties. Further, Lufthansa has refused to meaningfully entertain compromise. Already Thales Avionics has already provided extensive information about its business operations, including intricate details related to thousands of transactions, custom-tailored to accommodate Lufthansa's demands.

154.    If the Court determines any further response is appropriate, Thales Avionics respectfully requests that the Court specify the exact dimensions of any further response so as to avoid any further meet and confer or motion practice efforts between the parties, and condition such discovery on Lufthansa reimbursing Thales Avionics's costs and expenses associated with such discovery.

155.    Finally, Thales Avionics requests that it be awarded its costs in preparing this Motion, as the demonstratively dispositive factor in requiring this action is Lufthansa's express (but tardy) refusal to consider any compromise in this action.

45164448.1

1   Dated: August 22, 2020

2

3                                   Respectfully submitted,

4                                   By: */s/ Alexis A. Smith*

5                                          Alexis Adian Smith (SBN 274429)
                                           JONES DAY
6                                          555 South Flower Street, Fiftieth Floor
                                           Los Angeles, CA 90071.2452
7                                          Telephone:    +1.213.489.3939
                                           Facsimile:    +1.213.243.2539
8                                          asmith@jonesday.com

9                                          Lawrence D. Rosenberg
                                           (admitted *pro hac vice*)
10                                         JONES DAY
                                           51 Louisiana Avenue, N.W.
11                                         Washington, D.C.  20001.2113
                                           Telephone:    +1.202.879.3939
12                                         Facsimile:    +1.202.626.1700
                                           ldrosenberg@jonesday.com

13                                         Attorneys for Petitioner
                                           LUFTHANSA TECHNIK AG
14

15                                  By: */s/ Daniel Morris*

16

17                                         DANIEL MORRIS (pro hac vice)
                                           danielmorris@eversheds-sutherland.com
18                                         EVERSHEDS SUTHERLAND (US) LLP
19                                         700 6th Street, N.W., Suite 700
                                           Washington, DC 20001
20                                         Telephone: (202) 220-8348
                                           Facsimile: (202) 637-3593
21

22                                         RONALD D. KENT (Bar No. 100717 )
                                           ronald.kent@dentons.com
23                                         DENTONS US LLP
24                                         4675 MacArthur Court, Suite 1250
                                           Newport Beach, CA 92660
25                                         Telephone: (949) 732-3700
                                           Facsimile: (949) 732-3739
26

27                                         Attorneys for Respondent Thales Avionics,
28                                         Inc.

45164448.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **ATTESTATION**

In accordance with Local Rule 5-4.3.4(a)(2), I attest that concurrence in the filing of this document has been obtained from all other signatories listed and on whose behalf this filing is submitted.

Respectfully submitted,

By: */s/ Alexis A. Smith*
_____

Alexis Adian Smith (SBN 274429)
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071.2452
Telephone:    +1.213.489.3939
Facsimile:     +1.213.243.2539
asmith@jonesday.com

Attorneys for Petitioner
LUFTHANSA TECHNIK AG

LR 37 JT. STIP. RE. LHT MOT. TO COMPEL
CASE NO. 8:19-MC-00016-UA-KES

45164448.1